Peter L. POODRY, David C. Peters, Susan LaFromboise, John A. Redeye, and Stonehorse Lone Goeman, Petitioners–Appellants,

v.

TONAWANDA BAND OF SENECA INDIANS; Bernard Parker, a/k/a Ganogehdaho; Kervin Jonathan, a/k/a Skongataigo; Emerson Webster, a/k/a Gauhnahgoi; Darren Jimerson, a/k/a Sohjeahnohous; Harley Gordon, a/k/a Gah–En–Keh; James Logan; and Darwin Hill, Respondents–Appellees.

No. 492, Docket 95–7490, 95–7492, 95–7498, 95–7502 and 95–7504.

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1995.

Decided May 16, 1996.

Joseph E. Zdarsky, Buffalo, New York, James Cohen, Minneapolis, Minnesota (Gerald T. Walsh, Zdarsky, Sawicki & Agostinelli, Buffalo, New York, of counsel), for petitioners-appellants.

Harold M. Halpern, Buffalo, New York (Borins, Halpern & Stromberg), for respondents-appellees.

Before FEINBERG, JACOBS, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

The petitioners are members of the Tonawanda Band of Seneca Indians, a federally recognized Indian tribe. They claim that on January 24, 1992, certain tribal officials summarily convicted them of "treason" and sentenced them to permanent "banishment" from the Tonawanda Seneca Indian Reservation ("Tonawanda Reservation"). The orders of "banishment" read in part as follows: "You are to leave now and never return.... [Y]our name is removed from the Tribal rolls, your Indian name is taken away, and your lands will become the responsibility of the Council of Chiefs. You are now stripped of your Indian citizenship and permanently lose any and all rights afforded our members. YOU MUST LEAVE IMMEDIATELY AND WE WILL WALK WITH YOU TO THE OUTER BORDERS OF OUR TERRITORY." The petitioners claim that the banishment orders amount to a criminal conviction in violation of rights guaranteed under Title I of the Indian Civil Rights Act of 1968 ("ICRA" or "Act"), 25 U.S.C. §§ 1301–1303. In November 1992, they sought writs of habeas corpus in the United States District Court for the Western District of New York. In this case of first impression, the district court (Richard J. Arcara, *Judge*) concluded that the threat of permanent banishment was not a sufficient restraint on liberty to trigger the application of the ICRA's habeas corpus provision. The court therefore dismissed the petitions for lack of subject matter jurisdiction.

The respondents invite us to hold that the petitioners—citizens of the United States residing within our borders—cannot challenge the threatened loss of their tribal membership, cultural and religious identity, and property under the laws of the United States. It is undisputed that no avenue for tribal review of the actions of the members of the Council of Chiefs is available in this case. Accordingly, if the district court lacks subject matter jurisdiction to entertain the applications for writs of habeas corpus, the petitioners have no remedy whatsoever. We decline the respondents' invitation to hold that under

current law basic American principles of due process are wholly irrelevant in these circumstances, or that the federal courts are completely divested of authority to consider whether the alleged actions of the members of the tribal Council of Chiefs conform to those principles. We conclude that the district court based its dismissal of the petitions on an erroneous view of the scope of the ICRA's habeas corpus provision. We therefore vacate the orders of dismissal and remand for further proceedings.

# I

The Tonawanda Band of Seneca Indians is a federally recognized Indian tribe occupying a 7,500-acre reservation near Akron, New York. Along with Seneca Indians now occupying the Cattaraugus and Allegany reservations in upstate New York, the Band was formerly recognized as the Seneca Nation, one of six nations known collectively as the Haudenosaunee or the Iroquois Confederacy.[1] Unlike the Indians currently recognized as the Seneca Nation—i.e., the Seneca Indians of the Cattaraugus and Allegany Reservations—the Tonawanda Band retains the traditional governing institution of the Confederacy: the tribal Council of Chiefs ("the Council"), which carries out the views of the tribe on matters of internal governance. The petitioners claim, and the respondents do not appear to dispute, that this traditional form of Seneca government is based on consensus. The Tonawanda Band consists of eight "clans": the Snipe, the Heron, the Hawk, the Deer, the Wolf, the Beaver, the Bear, and the Turtle. Each clan appoints a clan mother, who in turn appoints an individual to serve as Chief. The clan mother retains the power to remove a Chief and, in consultation with members of the clan, provides recommendations to the Chief on matters of tribal government.[2] The clan mothers cannot disregard the views of the clan, nor can the Chiefs disregard the recommendations of the clan mothers.

The petitioners also claim that the Tonawanda Band has held regular tribal elections, recognized under § 41 of the New York Indian Law (McKinney 1950), for President, Clerk, Treasurer, Peacemakers, and Marshal. The duties of these offices, or the functional relationship between these elected officials and the tribe's traditional government structure, are not clear from the record.

In November and December 1991, a dispute arose on the Tonawanda Reservation concerning alleged misconduct by certain members of the Tonawanda Council of Chiefs. The petitioners, Peter L. Poodry, David C. Peters, Susan LaFromboise, John A. Redeye, and Stonehorse Lone Goeman, and others, apparently accused members of the Council, particularly its Chairman, respondent Bernard Parker, of misusing tribal funds, suspending tribal elections, excluding members of the Council of Chiefs from the tribe's business affairs, and burning tribal

---

1. The split between the Tonawanda Band and the remainder of the Seneca Nation occurred in the mid-1800's. In 1838, nine Indian nations, including the Seneca Nation, entered a treaty with the United States providing for their withdrawal to a tract of land west of Missouri. Treaty of Buffalo Creek, Jan. 15, 1838, 7 Stat. 550; see United States v. New York Indians, 173 U.S. 464, 468, 19 S.Ct. 487, 489, 43 L.Ed. 769 (1899). A section of the treaty acknowledged that the four reservations then occupied by the Seneca Nation, including the Tonawanda Reservation, would be purchased by the Ogden Land Company. The treaty was modified in 1842 by a second treaty between the United States and the Seneca Nation, which reflected the purchase by Ogden of only two of the four Seneca reservations, including the Tonawanda Reservation. The chiefs of the Tonawanda Band had apparently signed neither treaty, and the Seneca Indians residing on the Tonawanda Reservation refused to leave their

land. See generally Fellows v. Blacksmith, 60 U.S. (19 How.) 366, 15 L.Ed. 684 (1856) (recognizing objection of Tonawanda Band to 1838 and 1842 treaties; acknowledging that power to remove members of Tonawanda Band from reservation lay solely with federal government).

In 1848, the Seneca Indians of the Cattaraugus and Allegany reservations held a constitutional convention and adopted a non-traditional, elective form of government. The Tonawanda Band secured federal recognition as a distinct and independent Indian nation in 1857.

2. Affidavits filed in support of the petitions by a member of the Council of Chiefs and by the Hawk clan mother suggest that three clans—the Heron, Deer, and Beaver—lost the right to have a clan mother or a Chief advise on matters of tribal government in the nineteenth century after engaging in illegal land transactions.

records. Allegedly in consultation with other members of the tribe, the petitioners formed an Interim General Council of the Tonawanda Band.

Petitioners Poodry, Peters, and LaFromboise claim that on January 24, 1992, they were accosted at their homes by groups of fifteen to twenty-five persons bearing the following notice:

It is with a great deal of sorrow that we inform you that you are now banished from the territories of the Tonawanda Band of the Seneca Nation. You are to leave now and never return.

According to the customs and usage of the Tonawanda Band of the Seneca Nation and the HAUDENOSAUNEE, no warnings are required before banishment for acts of murder, rape, or treason.

Your actions to overthrow, or otherwise bring about the removal of, the traditional government at the Tonawanda Band of Seneca Nation, and further by becoming a member of the Interim General Council, are considered treason. Therefore, banishment is required.

According to the customs and usage of the Tonawanda Band of Seneca Nation and the HAUDENOSAUNEE, your name is removed from the Tribal rolls, your Indian name is taken away, and your lands will become the responsibility of the Council of Chiefs. You are now stripped of your Indian citizenship and permanently lose any and all rights afforded our members.

YOU MUST LEAVE IMMEDIATELY AND WE WILL WALK WITH YOU TO THE OUTER BORDERS OF OUR TERRITORY.

The individuals bearing the notices attempted (without success) to take petitioners Poodry, Peters, and LaFromboise into custody and eject them from the reservation. Petitioners John A. Redeye and Stonehorse Lone Goeman received identical notices by mail. The notices were signed by respondents Parker, Kervin Jonathan, Emerson Webster, Darren Jimerson, Harley Gordon, and James Logan, all members of the Tonawanda Band's Council of Chiefs.[3] Respondent Darwin Hill, whose signature does not appear on the notices, is the tribal clerk.

After this initial attempt to remove the petitioners from the reservation, the respondents and persons purporting to act on their behalf allegedly continued to harass and assault the petitioners and their family members, attacking petitioner LaFromboise on Main Street in Akron and "stoning" petitioner Peters. The petitioners also claim to have been denied electrical service to their homes and businesses, at the direction of the Council.[4] In early February 1992, the respondents sent notices of the petitioners' "convict[ion]" and "banishment" to, *inter alia*, President Bush, the Bureau of Indian Affairs of the Department of the Interior, Governor Cuomo, Senator D'Amato, Senator Moynihan, and other federal and state officials, requesting recognition of the banishment orders and/or assistance in removing the petitioners from the Tonawanda Reservation. The New York Department of Public Health, which operates the Tonawanda Indian Reservation Medical Clinic, instructed the clinic (by an unsigned letter) to remove the petitioners from its list of eligible members; thereafter the petitioners were allegedly denied the health services and medications provided to other members of the tribe, both at the clinic and at local pharmacies. On February 3, 1992, the Bureau of Indian Affairs, in response to the political upheaval on the reservation, issued a notice that it continued to recognize "the traditional Council of Chiefs as the legal governing body of the Tonawanda Band of the Seneca Nation." On February 25, 1992, the clan mother of the

---

**3.** The notices were not signed by two other members of the Council of Chiefs, Chief Corbett Sundown of the Hawk Clan (now deceased) and Chief Roy Poodry of the Snipe Clan. The petitioners contend that Chief Sundown and Chief Poodry were excluded from Council meetings; the respondents contend that both were ill and therefore inactive.

**4.** The Council's position that the provision of new or changed electrical service to the petitioners requires its prior approval is the subject of a separate proceeding, involving the public utility company that serves the reservation, the tribe and its officers, and the "banished" individuals. *See Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, No. 95–9014 (2d Cir.) (argued and submitted May 7, 1996).

Snipe clan allegedly removed respondent Bernard Parker as Chief. According to the petitioners, however, Parker continues to claim the chairmanship of the Council of Chiefs.[5]

The five targeted individuals filed petitions for writs of habeas corpus in the United States District Court for the Western District of New York on November 10, 1992, claiming that they had been denied several rights guaranteed under Title I of the Indian Civil Rights Act of 1968, including the right to a trial, the right to be informed of the nature or cause of accusations against them, the right to confront witnesses, the right to assistance of counsel, see 25 U.S.C. § 1302(6), and the right to assemble peaceably, see id. § 1302(1). The petitioners also claimed violations of the ICRA's prohibitions on cruel and unusual punishment, bills of attainder, and deprivations of liberty and property without due process of law. See 25 U.S.C. § 1302(7), (8), (9). The respondents filed motions to dismiss on January 13, 1993, claiming that the petitioners had been stripped of their Indian membership as a result of an internal tribal political dispute and that the district court therefore lacked subject matter jurisdiction over the petitions. On April 13, 1995, the district court dismissed the petitions for lack of subject matter jurisdiction, holding that banishment could not trigger application of the ICRA's habeas corpus provision. This appeal followed.

## II

We face here a question of federal Indian law not yet addressed by any federal court: whether an Indian stripped of tribal membership and "banished" from a reservation has recourse in a federal forum to test the legality of the tribe's actions. More specifically, the issue is whether the habeas corpus provision of the Indian Civil Rights Act of 1968, 25 U.S.C. § 1303, allows a federal court to review punitive measures imposed by a tribe upon its members, when those measures involve "banishment" rather than imprisonment. We conclude that the ICRA's habeas provision affords the petitioners access to a federal court to test the legality of their "convict[ion]" and subsequent "banishment" from the reservation and that the district court therefore erred in dismissing the petitions for writs of habeas corpus on jurisdictional grounds.

We first examine certain principles of federal Indian law that will guide our inquiry and explore briefly the substance and legislative history of the statute at issue in this case, Title I of the Indian Civil Rights Act of 1968. We then turn to the question of subject matter jurisdiction. Informed by *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the only Supreme Court case analyzing the structure, purpose, and history of the ICRA, we examine the parties' respective claims with respect to subject matter jurisdiction. The respondents contend that the orders of permanent banishment are "civil" in nature, representing "membership determinations" committed to the absolute discretion of the tribe and unreviewable under the ICRA; the petitioners argue that the orders constitute criminal sanctions, and that habeas review under the ICRA is available for all tribal actions taken in a criminal context. We accept neither argument in full. We reject the respondents' claim that all tribal actions affecting membership are necessarily "civil" in nature and conclude that the orders of permanent banishment constitute punitive sanctions imposed for allegedly criminal behavior. Nonetheless, we find that the imposition of a criminal sanction is not *itself* sufficient to permit a district court to entertain an application for a writ of habeas corpus under the ICRA. We thus reject the petitioners' argument that the habeas provision of the ICRA, 25 U.S.C. § 1303, was intended to have broader reach than cognate statutory provisions governing collateral review of state and

---

**5.** The petitioners also suggest that respondent Parker is, by his mother's blood line, a member of the Heron clan, which is not entitled to appoint a Chief. See supra note 2. They claim that he was merely a temporary Chief of the Snipe clan, and, though the self-proclaimed "Chairman" of the Council for several years, has no entitlement to that position. It appears that Chief Roy Poodry is also a Chief of the Snipe clan, see supra note 3; there is no clarification of this matter in the record.

federal action. As with other statutory provisions governing habeas relief, one seeking to invoke jurisdiction of a federal court under § 1303 must demonstrate, under *Jones v. Cunningham*, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963), and its progeny, a severe actual or potential restraint on liberty. We conclude that the petitioners have done so here; the district court therefore improperly dismissed the applications for writs of habeas corpus.

Having concluded that the petitions should be considered on the merits, we examine the petitioners' claim that the tribe itself is a proper respondent in this action. We agree with the district court that it is not. The petitions for writs of habeas corpus are properly viewed as proceeding against *tribal officials* allegedly acting in violation of federal law and therefore outside of the lawful authority of the tribe; the petitions do not create actions against the tribe at all.

A. *Background: Tribal Sovereignty and Congressional Power*

■ Although this case requires that we undertake an unusual jurisdictional inquiry in a complex area of federal law, we are guided by certain well-established principles. Federal courts have long acknowledged that Indian nations possess a unique status in our constitutional order. As Chief Justice Marshall first recognized in the famous Cherokee cases, Indian tribes are distinct political entities retaining inherent powers to manage internal tribal matters. *See Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832). Recognition that tribes "retain" certain aspects of sovereignty—*i.e.*, that tribes are not depen-

dent upon the federal government for powers of internal self-government—has led to repeated judicial acknowledgements of certain specific rights that federally recognized Indian tribes possess in the United States, absent limitation by treaty or federal statute: to determine questions of membership, *see*, *e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n. 32, 98 S.Ct. 1670, 1684 n. 32, 56 L.Ed.2d 106 (1978); *United States v. Wheeler*, 435 U.S. 313, 322 n. 18, 98 S.Ct. 1079, 1086 n. 18, 55 L.Ed.2d 303 (1978); to control the use of their natural resources, *see Tulee v. Washington*, 315 U.S. 681, 685, 62 S.Ct. 862, 864–65, 86 L.Ed. 1115 (1942); *see also Menominee Tribe v. United States*, 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–11, 20 L.Ed.2d 697 (1968); to adjudicate civil disputes arising on their territory (with certain limitations on the power to exercise jurisdiction over non-Indians), *see Fisher v. District Court*, 424 U.S. 382, 388–89, 96 S.Ct. 943, 947–48, 47 L.Ed.2d 106 (1976) (per curiam); *Williams v. Lee*, 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959); *see also Montana v. United States*, 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981); *A–1 Contractors v. Strate*, 76 F.3d 930, 940 (8th Cir.1996) (en banc); and to prescribe criminal laws applicable to Indians within their territorial borders and impose appropriate sanctions, *see United States v. Antelope*, 430 U.S. 641, 643 n. 2, 97 S.Ct. 1395, 1397 n. 2, 51 L.Ed.2d 701 (1977).[6]

■ Because tribal powers of self-government are "retained" and predate the federal Constitution, those constitutional limitations that are by their terms or by implication framed as limitations on *federal* and *state* authority do not apply to tribal institutions

6. This power has been significantly limited by statute. Congress has conferred on federal courts criminal jurisdiction over major offenses committed by or against an Indian within Indian territory. *See* 18 U.S.C. § 1153(a) (establishing as federal crimes fourteen major crimes committed by an Indian on an Indian reservation); *id.* § 3242 (providing that Indian charged with offense punishable under § 1153 "shall be tried in the same courts and in the same manner as are all other persons committing such offense within the exclusive jurisdiction of the United States"); *id.* § 1152 (conferring on federal courts criminal jurisdiction over offenses committed within "Indian country," except by one Indian against another). A crime committed by a non-Indian against a non-Indian within Indian territory is subject to state jurisdiction. *See United States v. McBratney*, 104 U.S. 621, 624, 26 L.Ed. 869 (1882); *cf. Donnelly v. United States*, 228 U.S. 243, 271–72, 33 S.Ct. 449, 458–59, 57 L.Ed. 820 (1913). Tribal criminal jurisdiction includes jurisdiction over non-member Indians. *See* Pub.L. No. 101–511, § 8077(b), (c), 104 Stat. 1856, 1892–93 (1990) (overturning result of *Duro v. Reina*, 495 U.S. 676, 695–96, 110 S.Ct. 2053, 2064–65, 109 L.Ed.2d 693 (1990)).

exercising powers of self-government with respect to members of the tribe or others within the tribe's jurisdiction. Thus, in *Talton v. Mayes,* the Court found that criminal courts of the Cherokee Nation were not subject to the Fifth Amendment's requirement of indictment by grand jury. 163 U.S. 376, 384, 16 S.Ct. 986, 989, 41 L.Ed. 196 (1896). Although Congress could "regulate the manner in which the local powers of the Cherokee [N]ation shall be exercised," those local powers existed prior to the Constitution and were "not operated upon by the Fifth Amendment." *Id.* Following *Talton,* courts concluded that other provisions of the Bill of Rights as well as the Fourteenth Amendment do not constrain the powers of self-government enjoyed by Indian tribes. *See Martinez v. Southern Ute Tribe of the Southern Ute Reservation,* 249 F.2d 915, 919 (10th Cir.1957) (Due Process Clause of Fifth Amendment), *cert. denied,* 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958); *Native American Church v. Navajo Tribal Council,* 272 F.2d 131, 134 (10th Cir.1959) (free exercise of religious beliefs under First and Fourteenth Amendments); *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529, 533 (8th Cir.1967) (Due Process Clause of Fourteenth Amendment).[7]

■ However, as acknowledged by those cases recognizing specific areas of tribal authority and declining to read constitutional provisions as limiting that authority, even aspects of "sovereignty" thought to derive from the status of Indian nations as distinct, self-governing entities are subject to congressional limitation. *See, e.g., National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 851 & n. 10, 105 S.Ct. 2447, 2451 & n. 10, 85 L.Ed.2d 818 (1985) ("'[A]ll aspects of Indian sovereignty are subject to defeasance by Congress.'" (quoting *Escondido Mut. Water Co. v. La Jolla Bands of Mission Indians,* 466 U.S. 765, 787 n. 30, 104 S.Ct. 2105, 2118 n. 30, 80 L.Ed.2d 753 (1984))); *Wallace v. Adams,* 204 U.S. 415, 423, 27 S.Ct. 363, 366, 51 L.Ed. 547 (1907) ("The power of Congress over the matter of citizenship in ... Indian tribes was plenary."). *See generally* William C. Canby, Jr., *The Status of Indian Tribes in American Law Today,* 62 WASH. L. REV. 1, 3–4 (1987).[8] In 1968, Congress passed what is perhaps the most significant limitation on tribal sovereignty: Title I of the Indian Civil Rights Act of 1968, Pub.L. No. 90–284, §§ 201–203, 82 Stat. 73, 77–78 (codified as amended at 25 U.S.C. §§ 1301–1303).[9]

### B. *The Indian Civil Rights Act of 1968*

■ With Title I of the Act, Congress sought to limit the effects of *Talton* and its progeny by applying some basic constitutional norms to tribal governments, in the form of restrictions similar to those contained in the Bill of Rights and the Fourteenth Amendment. Accordingly, 25 U.S.C. § 1302 provides as follows:

---

**7.** Members of federally recognized Indian tribes are citizens of the United States and are therefore afforded constitutional protection against violations of individual rights by *federal* and *state* institutions, but constitutional provisions limiting federal or state authority are of no force in constraining actions of tribal governments. *See* 8 U.S.C. § 1401(b) (providing that a person born in the United States to a member of an Indian tribe shall be a national and citizen of the United States at birth).

**8.** The congressional power to legislate on tribal affairs, often referred to as "plenary," is not absolute. *See generally Shoshone Tribe v. United States,* 299 U.S. 476, 497, 57 S.Ct. 244, 251–52, 81 L.Ed. 360 (1937); *Chippewa Indians of Minnesota v. United States,* 301 U.S. 358, 375–76, 57 S.Ct. 826, 833–34, 81 L.Ed. 1156 (1937). Legislation must be tied rationally to Congress's "trust" obligations with respect to the welfare of

Indian nations. *See Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974); *see also United States v. Sioux Nation,* 448 U.S. 371, 415–16, 100 S.Ct. 2716, 2740–41, 65 L.Ed.2d 844 (1980); *Delaware Tribal Bus. Comm. v. Weeks,* 430 U.S. 73, 85, 97 S.Ct. 911, 919, 51 L.Ed.2d 173 (1977). The respondents do not challenge Congress's power to enact the ICRA, the statute at issue in this case.

**9.** We refer here, as elsewhere, to the Title designations in S. 1843, an Indian civil rights measure passed by the Senate on December 7, 1967. 113 CONG. REC. 35,473 (1967). S. 1843 was identical to Amendment No. 430 to H.R. 2516, the broader civil rights measure signed into law on April 11, 1968, as Public Law 90–284. *See infra* pp. 883–884. Titles II through VII of Public Law 90–284 are collectively known as the Indian Civil Rights Act of 1968, and correspond to Titles I through VI of S. 1843.

No Indian tribe in exercising powers of self-government shall—

(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures [sic], nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

(3) subject [sic] any person for the same offense to be twice put in jeopardy;

(4) compel any person in any criminal case to be a witness against himself;

(5) take any private property for a public use without just compensation;

(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year or a fine of $5000, or both;

(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

(9) pass any bill of attainder or ex post facto law; or

(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

Among the most notable distinctions between § 1302 and cognate constitutional provisions, as interpreted, are the absence in the ICRA of a clause prohibiting the establishment of religion; the omission of a right to the assistance of counsel for the indigent accused; the absence of a right to a jury trial in civil cases; and the specific limitations on terms of imprisonment and fines. Title I of the ICRA identifies explicitly only one federal court procedure for enforcement of the substantive guarantees of § 1302: § 1303 makes available to any person "[t]he privilege of the writ of habeas corpus . . ., in a court of the United States, to test the legality of his detention by order of an Indian tribe." [10]

A brief digression may be in order here, to explain some of the legislative history of this important statute and some of the underlying policy conflicts. The Indian Civil Rights Act was the product of seven years of sporadic legislative effort on Indian affairs. Beginning in August 1961, the Subcommittee on

---

**10.** Title I of the ICRA was part of a broader package of measures affecting Indian governments. Title II of the ICRA (Title III of Public Law 90–284) required the Secretary of the Interior to recommend to Congress a model code governing the administration of justice by courts of Indian offenses on Indian reservations. Pub.L. No. 90–284, § 301, 82 Stat. at 78 (codified at 25 U.S.C. § 1311). Title III of the ICRA amended the controversial Public Law 280, which had ceded to five states—and provided other states with the opportunity to assume— jurisdiction over crimes committed by or against Indians on Indian territory and jurisdiction over civil causes to which Indians were parties and arising in Indian territory, Pub.L. No. 83–280, 67 Stat. 588, 589 (1953) (codified as amended at 18 U.S.C. § 1162, 28 U.S.C. § 1360); Title III provided that states could only assume jurisdiction with the consent of the affected tribe and permit- ted the federal government to accept any retrocession by states of any measure of criminal or civil jurisdiction previously acquired under Public Law 280. Pub.L. No. 90–284, §§ 401–406, 82 Stat. at 78–80 (codified at 25 U.S.C. §§ 1321– 1326). Title IV broadened the category of major crimes over which the federal government would have jurisdiction to include "assault resulting in serious bodily injury." *Id.* § 501, 82 Stat. at 80 (codified at 18 U.S.C. § 1153). Title V of the ICRA placed a time limit upon the Department of Interior's approval of contracts between tribes and their attorneys, providing that any contract not acted upon within ninety days would be deemed approved. *Id.* § 601, 82 Stat. at 80 (codified at 25 U.S.C. § 1331). Finally, Title VI required the Secretary of the Interior to revise various federally published materials relating to the rights of Indians. *Id.* § 701, 82 Stat. at 80– 81 (codified at 25 U.S.C. § 1341).

Constitutional Rights of the Senate Judiciary Committee held a series of hearings exploring the relationship between tribes and their members and among tribes, state governments, and the federal government.[11] These hearings led in 1964 to the introduction of eight bills and a proposed resolution on Indian matters before the Eighty–Eighth Congress. S. 3041–3048 and S.J. Res. 188, 88th Cong., 2d Sess., 110 CONG. REC. 17,325–30 (1964). In 1965, the chief sponsor of the legislation, Senator Sam J. Ervin Jr. of North Carolina, reintroduced the bills and resolution as S. 961–968 and S.J. Res. 40 in the First Session of the Eighty–Ninth Congress. 111 CONG. REC. 1799–1803 (1965). Most relevant for our purposes are S. 961, which would have fully applied to tribal governments the "same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution," and S. 962, which would have authorized the direct appeal of a criminal conviction by a tribal court to a federal district court, with a trial *de novo* on appeal. The subcommittee conducted additional hearings on these proposed measures in June 1965.[12]

During the 1965 subcommittee hearings, various tribes, attorneys specializing in Indian affairs, and the Department of the Interior opposed both S. 961's wholesale application of constitutional restraints to Indian tribes and S. 962's prospect of a trial *de novo* in federal district court for anyone convicted in a tribal court. *See, e.g.,* Donald L. Burnett, Jr., *An Historical Analysis of the 1968 'Indian Civil Rights' Act,* 9 HARV. J. ON LEGIS. 557, 589–94 (1972); *see also 1965 Senate Hearings, supra* note 12, at 17–18, 22, 36,

84–85, 90, 130, 227; *1966 Summary Report, supra* note 12, at 9. Revised versions of the proposed bills and resolution were introduced on May 23, 1967, as S. 1843 through 1847 and S.J. Res. 87. 113 CONG. REC. 13,473–78 (1967). S. 961 and S. 962 had been joined as S. 1843; rather than applying the full complement of restraints existing under the Constitution, the revised bill enumerated specific rights against actions of tribal governments. The enumerated rights largely tracked recommendations offered by the Department of the Interior at the 1965 Senate Hearings. *See 1965 Senate Hearings, supra* note 12, at 318. S. 1843 included a provision making available to any person "[t]he privilege of the writ of habeas corpus . . . , in a court of the United States, to test the legality of his detention by order of an Indian tribe." S. 1843, 90th Cong., 1st Sess. § 103, 113 CONG. REC. 13,474 (1967). S. 1843 also preserved language from S. 962 regarding a right of appeal to a federal district court, but would have restricted the availability of trial *de novo* to circumstances in which the district court found "reasonable cause to believe, based upon the trial record," that the accused was deprived of his rights under the ICRA. *Id.* § 201, 113 CONG. REC. 13,474 (1967); *see also 1966 Summary Report, supra* note 12, at 25–26.

The bills were referred to the Senate Committee on the Judiciary, where they were consolidated and amended into one measure, S. 1843 as amended. This final version of S. 1843, as reported out of the Judiciary Committee, eliminated the provision that would have permitted a direct appeal of a tribal criminal conviction to federal district court, but preserved the habeas provision. S. 1843

11. *See Constitutional Rights of the American Indian: Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary Pursuant to S. Res. 53,* 87th Cong., 1st Sess., pt. 1 (1962) (*"1961 Senate Hearings pt. 1"*); *Constitutional Rights of the American Indian: Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary,* 87th Cong., 1st Sess., pt. 2 (1963); *Constitutional Rights of the American Indian: Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary Pursuant to S. Res. 260,* 87th Cong., 2d Sess., pt. 3 (1963); *Constitutional Rights of the American Indian: Hearings Before the Subcom-*

*mittee on Constitutional Rights of the Senate Committee on the Judiciary Pursuant to S. Res. 58,* 88th Cong., 1st Sess., pt. 4 (1964); *Senate Committee on the Judiciary, Summary Report of Hearings and Investigations Pursuant to S. Res. 265,* 88th Cong., 2d Sess. (1964).

12. *See Hearings on S. 961–968 and S.J. Res. 40 Before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee,* 89th Cong., 1st Sess. (1965) (*"1965 Senate Hearings"*); *Senate Committee on the Judiciary, Summary Report of Hearings and Investigations Pursuant to S. Res. 194,* 89th Cong., 2d Sess. (1966) (*"1966 Summary Report"*).

(as amended), 90th Cong., 1st Sess. § 103, 113 CONG. REC. 35,471 (1967); *see* S. REP. NO. 841, 90th Cong., 1st Sess. 2, 6 (1967). The Senate passed S. 1843, and its House equivalent was referred to the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs. 113 CONG. REC. 36,026 (1967).[13]

Meanwhile, the Senate equivalent of a more general civil rights bill passed by the House, H.R. 2516, had been referred to Senator Ervin's Subcommittee on Constitutional Rights of the Judiciary Committee. The subcommittee in late 1967 proposed a substitute measure that, among other things, included the Indian rights measures in a form identical to S. 1843 as amended (*i.e.*, as it would ultimately emerge from the Judiciary Committee). The Judiciary Committee did not report favorably on the substitute measure. S. REP. 721, 90th Cong., 1st Sess. 29, *reprinted in* 1968 U.S.C.C.A.N. 1837, 1863 (separate views of Senator Ervin). Senator Ervin introduced on the floor both the substitute bill, *see* Amendment No. 429 to H.R. 2516, 90th Cong., 1st Sess. §§ 201–701, 113 CONG. REC. 30,709–11 (1967), and a separate amendment to H.R. 2516 containing only the Indian rights provisions, *see* Amendment No. 430 to H.R. 2516, 90th Cong., 1st Sess. §§ 201–701, 113 CONG. REC. 30,711–12 (1967). During the next legislative session, the Senate considered and approved Amendment No. 430. *See* 114 CONG. REC. 5835–38 (1968). The Senate passed H.R. 2516 as amended on March 11, 1968. The bill was then approved by the House and signed into law by President Johnson on April 11, 1968.

### C. *Subject Matter Jurisdiction Under § 1303 of the ICRA*

The petitioners' applications for writs of habeas corpus claim that Title I of the Indian Civil Rights Act limits the authority of the members of the Tonawanda Council of Chiefs to take the actions alleged in this case. The question presented on this appeal is not whether the petitioners' interpretation of the substantive provisions of the Act is correct, but whether a federal district court has subject matter jurisdiction to examine the merits of this claim. The relief sought in this case is styled as a petition for a writ of habeas corpus. The thrust of the respondents' jurisdictional challenge is that the petitioners are not entitled to seek habeas relief in this case, because (1) the decision to "banish" the petitioners was "civil" in nature, and relief is available under § 1303 only in "criminal" cases; and (2) even if the respondents could be said to have imposed "criminal" sanctions upon the petitioners in this case, habeas relief is not available because the effects of the banishment orders did not constitute severe restraints on liberty.

For guidance in our inquiry, both parties call our attention to the only Supreme Court case addressing the structure, purpose, and legislative history of Title I of the ICRA: *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). That this case remains—after nearly two decades—the only detailed treatment of Title I of the ICRA is unsurprising, in light of its holding: that Title I does not establish a federal civil cause of action against a tribe or its officers, and that no such cause of action can be implied. *Santa Clara Pueblo* thus precluded federal interpretation of the substantive provisions of the ICRA, except in cases in which the relief sought could properly be cast as a writ of habeas corpus.[14] We have discovered few cases in which habeas

---

**13.** The House subcommittee held one day of hearings on proposed Indian civil rights bills, including the House equivalent of S. 1843, during the next legislative session. *See Rights of Members of Indian Tribes: Hearing on H.R. 15419 and Related Bills Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs*, 90th Cong., 2d Sess. (1968) ("*1968 House Hearing*").

**14.** There is an arguable, and narrow, exception to *Santa Clara Pueblo,* created by the Tenth Circuit in *Dry Creek Lodge, Inc. v. Arapahoe & Sho-*

*shone Tribes,* 623 F.2d 682, 685 (10th Cir.1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), permitting federal court adjudication of certain civil actions where there is no tribal remedy. The *Dry Creek* exception is not relevant for our purposes and its reasoning has been rejected by at least two other circuits, *see Shortbull v. Looking Elk,* 677 F.2d 645 (8th Cir.), *cert. denied,* 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982); *R.J. Williams Co. v. Fort Belknap Hous. Auth.,* 719 F.2d 979, 981 (9th Cir.), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); *Trans–Canada Enters.,*

jurisdiction has actually been invoked under § 1303, and even fewer examining the jurisdictional prerequisites of § 1303. Understandably, both parties therefore rely on the jurisdictional inquiry of *Santa Clara Pueblo* and characterize the underlying reasoning as dispositive of the quite different jurisdictional inquiry required in this case. The petitioners claim that *Santa Clara Pueblo* contemplates federal subject matter jurisdiction in virtually all circumstances in which a petitioner challenges tribal action taken in a *criminal* context. The respondents contend that the reasoning of *Santa Clara Pueblo*—and its recognition of tribal autonomy in matters of membership—precludes characterization of the petitioners' actions as actions for a writ of habeas corpus. For the petitioners, this jurisdictional question is more than technical: the respondents concede that there is no tribal review available in the circumstances of this case. If the reasoning of *Santa Clara Pueblo* forecloses federal habeas jurisdiction, the petitioners have no remedy whatsoever.

### 1. *Santa Clara Pueblo v. Martinez*

■ We turn, then, to *Santa Clara Pueblo*. Following enactment of the ICRA, numerous federal courts entertained suits involving claimed violations of Title I's substantive provisions. The exercise of subject matter jurisdiction was most often sustained under 28 U.S.C. § 1343(4), which confers jurisdiction over "any civil action authorized by law ... to secure equitable or other relief under any Act of Congress providing for the protection of civil rights." *See, e.g., Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 933 (10th Cir.1975); *Crowe v. Eastern Band of Cherokee Indians, Inc.*, 506 F.2d 1231, 1234 (4th Cir. 1974); *Johnson v. Lower Elwha Tribal Community*, 484 F.2d 200, 203 (9th Cir. 1973); *Luxon v. Rosebud Sioux Tribe of South Dakota*, 455 F.2d 698, 700 (8th Cir. 1972) (per curiam). *See generally* Alvin Ziontz, *In Defense of Tribal Sovereignty: An Analysis of Judicial Error in the Construction of the Indian Civil Rights Act*, 20

S.D. L. Rev. 1, 20–21 nn. 70–80 (1975) (collecting cases); U.S. Comm'n on Civil Rights, The Indian Civil Rights Act 12–14 (1991) (same). Those courts that exercised or sustained jurisdiction tended to address in perfunctory fashion, or to ignore altogether, two related elements of the jurisdictional inquiry: whether Title I of the ICRA creates a federal, civil cause of action; and whether Title I constitutes a waiver of tribal sovereign immunity. *But see Pinnow v. Shoshone Tribal Council*, 314 F.Supp. 1157, 1160 (D.Wyo.1970) (holding that, in light of tribal immunity, federal jurisdiction is unavailable absent express congressional authority), *aff'd on other grounds sub nom. Slattery v. Arapahoe Tribal Council*, 453 F.2d 278 (10th Cir.1971); *Luxon v. Rosebud Sioux Tribe of South Dakota*, 337 F.Supp. 243 (D.S.D.1971) (same), *rev'd per curiam*, 455 F.2d 698 (8th Cir.1972).

The Supreme Court squarely addressed these matters in *Santa Clara Pueblo*. While the Court acknowledged Congress's authority to impose restrictions on tribal autonomy, it held that federal enforcement of the substantive provisions of § 1302 is limited to those cases in which the remedy sought is a writ of habeas corpus.

In *Santa Clara Pueblo*, Julia Martinez, a female member of the Santa Clara Pueblo, sought to bar enforcement of a tribal ordinance that denied tribal membership to the children of female Santa Clarans who married outside the tribe, but not to the children of male Santa Clarans who married outside the tribe. Martinez's children were denied membership in the tribe because their father was a non-Pueblo Indian. Although the Martinez children resided with their mother on the Santa Clara Reservation, they would not have the opportunity to vote in tribal elections, hold secular office in the tribe, or remain on the reservation after their mother's death. 436 U.S. at 52–53, 98 S.Ct. at 1673–74. Martinez and one of her children filed suit on behalf of themselves and others similarly situated, seeking injunctive and declaratory relief under 25 U.S.C. § 1302(8),

*Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474 (9th Cir.1980), and limited by the Tenth Circuit itself, *see Ramey Constr. Co. v. Apache Tribe of the*

*Mescalero Reservation*, 673 F.2d 315, 319 n. 4 (10th Cir.1982); *White v. Pueblo of San Juan*, 728 F.2d 1307, 1311–12 (10th Cir.1984).

which, among other things, prohibits a tribal government from "deny[ing] to any person within its jurisdiction the equal protection of its laws."

As had other federal courts, the district court in *Santa Clara Pueblo* concluded that the substantive provisions of the ICRA impliedly authorized civil actions for equitable relief and acted as a waiver of tribal sovereign immunity. The court therefore found subject matter jurisdiction proper under § 1343(4). *Martinez v. Santa Clara Pueblo*, 402 F.Supp. 5, 6–11 (D.N.M.1975). After a bench trial, the court sustained the tribal ordinance. *Id.* at 18–19. On appeal, the Tenth Circuit upheld the finding of jurisdiction, but reversed on the merits, holding that the ordinance violated the ICRA's equal protection provision. 540 F.2d 1039, 1042, 1048 (10th Cir.1976).

The Supreme Court granted certiorari and reversed on jurisdictional grounds, finding that the Act neither served as a waiver of tribal sovereign immunity nor impliedly provided for a civil cause of action in federal courts against tribal officials. As to the first inquiry, the Court noted that tribes are protected against suit by the common law immunity traditionally enjoyed by sovereign powers. Because nothing in Title I of the ICRA—including the Act's habeas provision—could be read as a general waiver of sovereign immunity, suits against the tribe itself under the ICRA were barred. *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. at 1677. Relying on *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908), for the proposition that tribal *officials* are not absolutely immune from suit, 436 U.S. at 59, 98 S.Ct. at 1677, the Court turned to whether the civil cause of action against tribal officials asserted by the respondents was implicit in Title I of the ICRA. It concluded that it was not, looking first to the structure and purpose of the Act and then to the legislative history of the Act's habeas provision. The Court reasoned that the structure and substantive provisions of the ICRA reflected two "distinct and competing purposes": to guarantee the rights of individual members of the tribe, on the one hand, and to further Indian self-government,

on the other. *Id.* at 62–63, 98 S.Ct. at 1679. While inferring a civil cause of action against tribal officials for enforcement of the ICRA would serve the former objective, it would disserve the latter. In light of the availability of tribal judicial and nonjudicial institutions to apply the ICRA's provisions, the Court found that implication of a civil cause of action against tribal officials was not necessary to effectuate Congress's objective of extending constitutional protections to tribal governments. *Id.* at 64–66, 98 S.Ct. at 1680–81. To infer a cause of action to address matters previously confined to tribal competence would "disturb the balance between the dual statutory objectives which Congress apparently struck in providing only for habeas corpus relief." *Id.* at 66, 98 S.Ct. at 1681.

The Court found that the legislative history of the ICRA's habeas review provision, 25 U.S.C. § 1303, buttressed the conclusion that recognition of a federal civil cause of action would be inappropriate. As discussed *supra* pp. 883–884, an earlier version of the legislation that emerged from Congress as the Indian Civil Rights Act had contained a provision for direct appeal of a criminal conviction to federal district court, with trial *de novo* on appeal. *See* S. 962, 89th Cong, 1st Sess., 111 CONG. REC. 1800 (1965). That approach was ultimately abandoned in favor of the more limited formula guaranteeing federal habeas review. 436 U.S. at 67, 98 S.Ct. at 1681–82. Similarly, the earlier bill contained another provision requiring the Attorney General to investigate complaints under the ICRA and, if necessary, to bring suit against a tribe in a federal court to enforce its provisions. *Id.* at 67–68, 98 S.Ct. at 1681–82; *see* S. 963, 89th Cong., 1st Sess., 111 CONG. REC. 1800 (1965). This provision was also dropped when the Indian civil rights legislation was reintroduced in the Ninetieth Congress. *See* S. 1843–1847 and S.J. Res. 87, 90th Cong, 1st Sess., 113 CONG. REC. 13,473–78 (1967). In addition, at the 1965 subcommittee hearings, the Department of the Interior had offered a proposal for a substitute bill that would have permitted the Secretary of the Interior to adjudicate civil complaints concerning tribal actions, with ultimate review of the administrative decision by federal courts. *See 1965 Senate Hearings, supra* note 12, at 318.

That approach was also rejected. *See* 436 U.S. at 68, 98 S.Ct. at 1682.

Finding that the legislative history reflected a careful selection of a particular, and narrow, federal remedy for violations of Title I of the ICRA—a petition for a writ of habeas corpus—the Court concluded that the implication of a federal civil cause of action would constitute undue interference with tribal autonomy.

*Santa Clara Pueblo* obviously does not speak directly to the scope of Title I's habeas provision, which was a matter not raised in that case. While our consideration of the instant case is necessarily informed by *Santa Clara Pueblo*'s discussion of the tension between individual rights and tribal autonomy, *Santa Clara Pueblo* does not resolve the jurisdictional inquiry here presented: whether the ICRA's habeas provision permits federal court review of the banishment orders.

### 2. *Criminal vs. Civil Action*

■ We examine first the parties' respective characterizations of the tribal action at issue in this case as exclusively "criminal" or "civil" in nature.[15] The relevance of this debate is not immediately obvious, insofar as § 1303 does not explicitly limit its scope to the criminal context: it speaks of "detention" by order of an Indian tribe as the sole jurisdictional prerequisite for federal habeas review. The respondents nonetheless contend that federal habeas review under § 1303 is available only where the alleged tribal violations of Title I occurred in a context safely or categorically described as "criminal." For this proposition, they rely upon a passage in *Santa Clara Pueblo* describing habeas review as the exclusive vehicle for "federal-court review of tribal criminal proceedings." 436 U.S. at 67, 98 S.Ct. at 1681. Of course, this language does not suggest that habeas jurisdiction is available *exclusively* as a vehicle for reviewing tribal criminal proceedings. That is, even if the dispute at hand is properly characterized as arising from a "civil" determination by a tribal government, that does not necessarily deprive a district court of subject matter jurisdiction to review tribal action under the substantive provisions of the ICRA if § 1303 would otherwise confer it.

Two factors, however, favor the respondents' position that § 1303 applies only in the context of a criminal charge or prosecution. First, in *Lehman v. Lycoming County Children's Services*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982), the Supreme Court discussed the scope of federal habeas review of a decision of another "sovereign"—in that case, a state. The Court observed that earlier cases had limited the availability of the writ of habeas corpus, when used to challenge a *state* court judgment, to situations where "as a result of a state-court *criminal conviction* ... a petitioner has suffered substantial restraints." *Id.* at 510, 102 S.Ct. at 3236–37 (emphasis supplied). Thus, a writ of habeas corpus was unavailable to test the legality of a state child custody order, which the Court denominated a question of "civil" law. We will return in due course to a discussion of whether § 1303 is to be read coextensively with federal statutes permitting collateral review of state or federal judgments, *see infra* pp. 890–893; we simply note that if § 1303 is indeed to be interpreted as coextensive with provisions making habeas review available to an individual in custody pursuant to a *state* judgment, federal court review may be limited to tribal action taken in the criminal context.

Second, the first set of Indian rights bills, introduced in 1964 and 1965, would have permitted the direct appeal to federal district court of a conviction "in any *criminal* action hereafter commenced in an Indian court." S. 962, 89th Cong., 1st Sess. (1965) (emphasis supplied); *see also* S. 3048, 88th Cong., 2d

---

15. We note that the respondents' challenge to subject matter jurisdiction in this case is "facial" rather than "factual." *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990); *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir.1983). That is, the respondents' motion to dismiss for lack of subject matter jurisdiction challenges the sufficiency of the jurisdictional

facts alleged, not the facts themselves. The parties do not dispute that the banishment orders were a direct response to the petitioners' efforts to form an alternative ruling council. The question we face is thus legal in nature, as we need only to determine whether the tribal Council of Chiefs treated these actions as "criminal" and responded with "punitive" measures.

Sess., 110 CONG. REC. 17,329 (1964). The original S. 1843, introduced in May 1967, preserved this language. S. 1843, 90th Cong., 1st Sess. § 201(a), 113 CONG. REC. 13,474 (1967). Since these proposed remedial sections referred specifically to criminal convictions, it would be possible to conclude that the remedial section ultimately enacted—providing for habeas review—was intended by Congress to apply only in criminal cases.

We note, however, that the ICRA's habeas provision *also* appeared in the original S. 1843. *See* S. 1843, 90th Cong., 1st Sess. § 103, 113 CONG. REC. 13,474 (1967). Accordingly, it is not accurate to say that the habeas provision *replaced* the section permitting a direct appeal; the latter was simply eliminated.[16] To put the matter simply: it is not possible to draw from Title I's legislative history a definitive conclusion as to whether Congress intended that habeas review be restricted to criminal convictions, or whether other circumstances of "detention" by a tribal court order could trigger habeas review. The report of the Senate Judiciary Committee—which eliminated the direct appeal provision—sheds no light on this issue. *See* S. REP. No. 841, 90th Cong., 1st Sess. (1967).

■ Because we conclude the tribal action in this case indeed arose in a criminal context, we ultimately need not resolve the question of whether habeas review is restricted to cases involving a tribal criminal conviction. The respondents' argument that the banishment orders issued against the petitioners reflected a "civil" determination relies principally on the Supreme Court's recognition in *Santa Clara Pueblo* that a tribe's right to define its membership is central to its autonomy. *See* 436 U.S. at 72 n. 32, 98 S.Ct. at 1684 n. 32. The respondents claim that *Santa Clara Pueblo* makes clear that (1) a federally recognized Indian nation possesses "*complete and absolute* authority to determine *all* questions of its own membership," Appellees' Br. at 12 (emphasis supplied); and (2) membership determinations "are consid-

ered civil in nature, regardless of the tribal values informing such determinations," *id.* at 18. *Santa Clara Pueblo* in fact supports neither statement. The first—that authority to determine membership questions is "complete and absolute"—simply goes too far. While Congress has deferred with regularity to tribal membership determinations, *see* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 23 (1982), there is little question that the power to define membership is subject to limitation by Congress, *see id.* at 248, 252 n. 84. Whether § 1302 of the ICRA does in fact impose any limits on tribal authority to determine questions of membership in the tribe is a question on the merits, and one not resolved in *Santa Clara Pueblo*.

The second point—that all membership determinations are "civil in nature"—is nowhere suggested or implied in *Santa Clara Pueblo*. While the Supreme Court observed in the course of its jurisdictional inquiry that a tribe's power to define its membership is an important element of its political and cultural autonomy, *see* 436 U.S. at 72 n. 32, 98 S.Ct. at 1684 n. 32, that observation does not compel the characterization of all actions of tribal governments affecting tribal membership as "civil in nature." We decline the respondents' invitation to equate the membership ordinance of the Santa Clara Pueblo, which had general, prospective application, with action taken by members of the Tonawanda Band Council of Chiefs against a handful of individuals found to have engaged in certain prohibited conduct—namely, "treason." The Supreme Court in *Santa Clara Pueblo* fully recognized Congress's conclusion that "the most serious abuses of tribal power had occurred in the administration of criminal justice," 436 U.S. at 71, 98 S.Ct. at 1683–84 (citing *1966 Summary Report, supra* note 12, at 24); the case before it simply did not involve the administration of criminal justice. The Court's observation that it would be unwise to *infer* a cause of action that would intrude upon a tribe's right to

---

**16.** Similarly, the language of the habeas provision in the original S. 1843 was drawn from the substitute bill proposed by the Department of the Interior during the 1965 subcommittee hearings. The Department's measure also contained *both* a

habeas provision and a proposal for direct appeal of a tribal court conviction to the Secretary of the Interior. *See 1965 Senate Hearings, supra* note 12, at 318 (§ 2(a)); *id.* at 319 (§ 3(b)).

adopt and enforce a membership ordinance does not bear upon whether an *explicitly created* habeas remedy applies where an individual—who concededly satisfies the general criteria for membership—is stripped of that membership in direct response to allegedly prohibited conduct.

In sum, *Santa Clara Pueblo* simply does not compel the conclusion that all membership determinations are "civil in nature" and therefore insulated from federal habeas review. While ordinarily the inquiry into whether a sanction is "criminal" or "civil" is neither simple nor mechanical, we have no doubt about its resolution here. The documents that the members of the Council of Chiefs served upon the petitioners and circulated to various government agencies indicate that the respondents themselves view the petitioners' conduct as "criminal": the petitioners are claimed to have engaged in "unlawful activities," including "actions to overthrow, or otherwise bring about the removal of, the traditional government" of the Tonawanda Band. For these actions, the petitioners were "convicted of TREASON." Moreover, "banishment" has clearly and historically been punitive in nature. Examining a statute imposing forfeiture of citizenship upon a natural-born citizen who evaded military service, the Supreme Court found reference to history "peculiarly appropriate":

> [F]orfeiture of citizenship and the related devices of banishment and exile have throughout history been used as punishment.... Banishment was a weapon in the English legal arsenal for centuries, but it was always adjudged a harsh punishment even by men who were accustomed to brutality in the administration of criminal justice.

*Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 170 n. 23, 83 S.Ct. 554, 568 n. 23, 9 L.Ed.2d 644 (1963) (citations and internal quotation marks omitted).

The respondents urged at oral argument that "treason," though a criminal act in our judicial system, is not necessarily "criminal" in a traditional nation such as the Tonawanda Band. We doubt that this appeal to cultural relativism is relevant to our inquiry. The respondents supply no basis for concluding that Congress intended courts to adopt a relativistic view of what constitutes a "crime" when it enacted § 1303: such a reading would permit a tribal government to evade the federal court review specifically provided in the Indian Civil Rights Act simply by characterizing every tribal government action as "civil" or non-punitive. *See also infra* pp. 900–901. Although we are required to construe ambiguity in statutes on Indian affairs in favor of preserving Indian sovereignty, *see, e.g., Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 152, 102 S.Ct. 894, 909, 71 L.Ed.2d 21 (1982), neither this principle nor *Santa Clara Pueblo*'s tentative and inconclusive assessment of congressional sensitivity to tribal tradition, *see* 436 U.S. at 72 n. 32, 98 S.Ct. at 1684 n. 32, calls for wholesale deference to arguments of cultural difference in assessing the scope of a habeas remedy *explicitly* created by a federal statute. The respondents would have us accept on faith their characterization of the alleged acts as non-criminal and the alleged sanction as non-punitive in the tradition and culture of the Tonawanda Band. In light of multiple sworn statements in the record—including those of a tribal Chief and of clan mothers of the Tonawanda clans—claiming that there is nothing traditional or culture-bound about the treatment of the petitioners at the hands of the respondents, we decline to do so.

### 3. *The Scope of § 1303*

The determination that we deal here with a criminal sanction does not end our inquiry. We must ascertain whether the petitioners are being "detained" within the meaning of § 1303. The petitioners contend that this inquiry is unnecessary, because an individual can seek a writ of habeas corpus in any case in which a tribe has taken a punitive action. More specifically, the petitioners argue that the "custody" requirement as developed under other habeas statutes is not relevant to whether a writ of habeas corpus is available against a tribal official, because the language of § 1303 differs from that of other statutes authorizing habeas relief and accordingly

contemplates a more expansive application. The district court declined to accept this argument, basing its dismissal for lack of subject matter jurisdiction on its conclusion that the banishment orders failed to give rise to a sufficient restraint on liberty to satisfy the traditional test for the availability of habeas relief. The petitioners challenge (1) the court's failure to give a broader reading to the statute, and, alternatively, (2) its conclusion that the banishment orders in this case would not satisfy the jurisdictional prerequisites of analogous habeas statutes. We conclude that we must conduct the same inquiry under § 1303 as required by other habeas statutes, but we find that, contrary to the district court's conclusion, § 1303 supplies a jurisdictional basis for federal court review of the tribal government action alleged in this case.

a. *§ 1303 and Analogous Habeas Statutes*

■■■ Section 1303 of the ICRA provides that "[t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the *legality of his detention* by order of an Indian tribe." (Emphasis supplied.) In contrast, 28 U.S.C. § 2241(c)(3), along with § 2254(a), serves as a basis for a federal court to exercise jurisdiction over one held *"in custody"* by a state "in violation of the Constitution or laws or treaties of the United States." (Emphasis supplied.) Similarly, 28 U.S.C. § 2255 permits a district court to entertain a motion by "a prisoner in custody under sentence" of a federal court; § 2241(c)(1), which authorizes relief from federal restraint mainly in noncriminal settings,[17] also uses the phrase "in custody." The question is whether we should look to the interpretation of the "custody" requirement of these cognate federal statutes to inform our interpretation of the term "detention" in § 1303.[18] The petitioners seize upon the difference in language to urge that Congress's use of the term "detention" in the ICRA was deliberate, and was intended to empower district courts to entertain a petition for habeas relief in a wider range of circumstances than the analogous provisions for relief from state and federal custody permit.

We are not persuaded. We find the choice of language unremarkable in light of references to "detention" in the federal statute authorizing a motion attacking a federal sentence, *see* § 2255, as well as in the procedural provisions accompanying § 2241, *see* §§ 2242, 2243, 2244(a), 2245, 2249, 2253.

17. Section 2241(c)(1) may be invoked, for example, in a challenge to a military service obligation, *see Strait v. Laird,* 406 U.S. 341, 346, 92 S.Ct. 1693, 1696, 32 L.Ed.2d 141 (1972), or a challenge to an alien's exclusion from the United States, *see Brownell v. We Shung,* 352 U.S. 180, 182–84, 77 S.Ct. 252, 254–55, 1 L.Ed.2d 225 (1956). *See also Burns v. Wilson,* 346 U.S. 137, 139, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953) (collateral attack upon a conviction in a court-martial proceeding). The statute has little contemporary relevance for federal prisoners, who must attack their sentences through the analogous statutory motion, § 2255. Section 2255 is essentially a venue provision, requiring a motion to the *sentencing* court rather than an application to the district court in the district in which the prisoner is confined. *See United States v. Hayman,* 342 U.S. 205, 215 n. 23, 219, 72 S.Ct. 263, 271 n. 23, 272, 96 L.Ed. 232 (1952).

18. A subsidiary issue is whether we should look solely to cases addressing collateral attacks on *state* custody. The respondents claim that only cases decided under §§ 2241(c)(3) and 2254 are relevant, because cases addressing federal custody—and particularly federal "custody" of non-prisoners (*i.e.,* those seeking relief under § 2241(c)(1))—do not involve the additional sensitivity required when a federal court's jurisdiction permits it to reconsider the ruling of another sovereign. *See Lehman,* 458 U.S. at 509 n. 9, 102 S.Ct. at 3236 n. 9. In this context, the parties dispute in particular the relevance of cases involving habeas review of an alien's exclusion from the United States. *See, e.g., Brownell,* 352 U.S. at 183, 77 S.Ct. at 254–55; *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 213, 73 S.Ct. 625, 629–30, 97 L.Ed. 956 (1953); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 540, 70 S.Ct. 309, 311, 94 L.Ed. 317 (1950); *United States v. Jung Ah Lung,* 124 U.S. 621, 626, 8 S.Ct. 663, 665–66, 31 L.Ed. 591 (1888).

While it is true that review of a tribal order necessarily involves review of another sovereign's action, there is an important distinction: congressional power to limit tribal sovereignty is plenary. Thus, where Congress specifically provides for habeas review of a tribal order—a limitation on sovereignty—it is not clear that federalism concerns arising in the state context are relevant. Nonetheless, because we think this case can be decided based on cases under §§ 2241(c)(3) and 2254, we do not resolve this question here.

Congress appears to use the terms "detention" and "custody" interchangeably in the habeas context. We are therefore reluctant to attach great weight to Congress's use of the word "detention" in § 1303.

The petitioners also urge us to look to the ICRA's legislative history to discern a congressional intent to create a more expansive role for federal court habeas review of actions of Indian governments than analogous statutes would permit of federal and, principally, state action. The petitioners call our attention to references in the ICRA's legislative history to protecting Indians from "arbitrary action" of tribal governments. While this language may speak to the scope of the ICRA's substantive provisions, it tells us nothing about the availability of a federal forum to enforce those provisions. Indeed, if anything, the legislative history suggests that § 1303 was to be read coextensively with analogous statutory provisions.

The language of § 1303—permitting any person "to test the legality of his detention by order of an Indian tribe"—was first introduced by the Department of the Interior at the 1965 Senate subcommittee hearings, see 1965 Senate Hearings, supra note 12, at 318, and closely tracks the language of Colliflower v. Garland, 342 F.2d 369 (9th Cir.1965), a case frequently invoked with approval during the 1965 hearings, see 1965 Senate Hearings, supra note 12, at 2, 24–25, 66–67, 91–92, 95, 220, 227; 1966 Summary Report, supra note 12, at 13; and cited in the final committee report accompanying the ICRA, see S. REP. No. 841, 90th Cong., 1st Sess. 9 (1967). See also 1968 House Hearing, supra note 13, at 47, 112–13. In Colliflower, the Ninth Circuit had concluded that an individual convicted of criminal trespass in a Court of Indian Offenses—that is, a court operating under the regulations of the Department of the Interior, see 25 C.F.R. pt. 11—on the Fort Belknap Reservation in Montana could seek federal habeas review of her conviction in federal court. The source of the substantive right allegedly violated was the Due Process Clause of the Fifth Amendment; the Court of Appeals read Talton v. Mayes, 163 U.S. 376, 384, 16 S.Ct. 986, 989, 41 L.Ed. 196 (1896), not to preclude invocation of that constitutional provision against a tribal government. 342 F.2d at 378. It premised the district court's subject matter jurisdiction on a finding that the reservation's courts, having been developed under the supervision and guidelines of the Department of the Interior's Bureau of Indian Affairs, functioned "in part as a federal agency and in part as a tribal agency." Id. at 379. The court concluded that 28 U.S.C. § 2241(c)(1) and (3) would support jurisdiction for review of a petition for habeas corpus by a person "'in custody under or by color of the authority of the United States' or 'in violation of the Constitution ... of the United States.'" Id. (alteration in original).

Although the Colliflower court spoke of the availability of habeas corpus to "test the legality of the detention of an Indian pursuant to an order of an Indian court," id. (emphasis supplied), the court's reliance on § 2241(c)(1) and (3) makes clear that it did not intend to suggest, much less hold, that the particular relationship of tribal governments to their members necessitated the availability of habeas relief in a broader range of circumstances than then-existing statutory provisions would allow—or that "detention" was a broader concept than "custody." See also Burnett, An Historical Analysis, supra, at 602 n. 240 (noting that § 1303 reflected incorporation of Colliflower formula). Although the Senate subcommittee hearings reflect references to habeas review, nowhere is there any detailed discussion of the scope of this remedy. See 1965 Senate Hearings, supra note 12, at 24, 57, 85, 91–92, 95, 227; see also 1961 Senate Hearings pt. 1, supra note 11, at 26, 84. Under the circumstances, the legislative history of the ICRA simply does not support the proposition that § 1303 was meant to be read more broadly than other habeas statutes.

In addition to claiming support in the legislative history for their view of § 1303's scope, the petitioners contend that cases decided under § 1303 confirm their position that the provision is not coextensive with other statutes providing for collateral relief. We disagree. Case law under § 1303 sheds little light on the issue; indeed, perhaps in part because criminal jurisdiction of tribal courts is restricted to crimes involving penal-

ties of no more than one year of imprisonment or a $5,000 fine,[19] *see* § 1302(7), there have been few habeas cases decided under § 1303—both pre- and post-*Santa Clara Pueblo*. Most such cases involve individuals jailed at the time of the filing of their habeas petition, *see Tom v. Sutton*, 533 F.2d 1101, 1106 (9th Cir.1976) (affirming denial of writ based on district court's conclusion that the ICRA does not supply a right to the assistance of appointed counsel); *Red Elk v. Silk*, No. CV83–13–GF, 10 Indian L. Rptr. 3110 (D.Mont. Apr. 6, 1983) (granting writ of habeas corpus where tribal court records did not reflect that petitioner was informed of right to jury trial), or individuals set to begin serving a jail sentence upon exhaustion of legal remedies, *see, e.g., Wounded Knee v. Andera*, 416 F.Supp. 1236, 1237, 1241 (D.S.D. 1976) (granting petition for writ of habeas corpus where petitioner was to serve five-day jail sentence; concluding that system in which tribal judge acts in dual capacity as prosecutor and judge is inherently violative of due process).

A few more recent § 1303 cases involve challenges to tribal court orders regarding child custody. In holding that federal habeas relief is not available under § 1303 to test the validity of a child custody decree of an Indian tribal court, courts have relied on the fact that the "custody involved is not the kind which has traditionally prompted federal courts to assert their jurisdiction [in challenges to state court custody decrees]." *Weatherwax on Behalf of Carlson v. Fairbanks*, 619 F.Supp. 294, 296 (D.Mont.1985);

*see Sandman v. Dakota*, 816 F.Supp. 448, 451 (W.D.Mich.1992) (following *Weatherwax*), *aff'd mem.*, 7 F.3d 234 (6th Cir.1993). Courts thus appear to look to the development of law under 28 U.S.C. § 2254 for guidance as to whether habeas relief is available in such matters under § 1303. *Weatherwax*, 619 F.Supp. at 296 n. 2 ("This court has consistently found the law which has developed with respect to actions for habeas corpus relief under 28 U.S.C. § 2254 to be applicable by analogy to actions founded upon 25 U.S.C. § 1303.").[20]

Only two cases appear to provide any authority for the proposition that the ICRA's habeas corpus provision should be more broadly construed than analogous statutes, and we do not find either of them dispositive or persuasive. In the case of *Settler v. Yakima Tribal Court*, 419 F.2d 486 (9th Cir.1969), *cert. denied*, 398 U.S. 903, 90 S.Ct. 1690, 26 L.Ed.2d 61 (1970), the Ninth Circuit held that an Indian convicted by the Yakima Tribal Court of violating tribal fishing regulations could seek federal habeas review of his conviction. The petitioner had been sentenced to a fine or suspension of his fishing privileges and had posted bond pending review of his conviction by an Indian appellate court. *Id.* at 488. The conviction and fine in *Settler* occurred prior to the enactment of the ICRA, and, despite *Talton* and its progeny, the Court of Appeals first concluded that tribal action "so summary and arbitrary as to shock the conscience" can trigger a constitutional violation. *Id.* at 489. It then found that the Yakima Nation's tribal courts, established

---

**19.** The limit on prison sentences was originally six months and the limit on fines $500. *See* Pub.L. No. 90–284, § 202(7), 82 Stat. at 77.

**20.** Some courts have concluded that a district court can entertain a habeas petition where the petitioner seeks to challenge the *jurisdiction* of a tribal court to render a custody decree, rather than the validity of that decree. *See DeMent v. Oglala Sioux Tribal Court*, 874 F.2d 510, 514 (8th Cir.1989) (permitting non-Indian father to challenge jurisdiction of tribal court to determine custody of his children, where he neither resided nor was domiciled within the jurisdiction of the tribal court); *United States ex rel. Cobell v. Cobell*, 503 F.2d 790 (9th Cir.1974) (upholding grant of petition for writ of habeas corpus where tribal court lacked jurisdiction to determine custody of children), *cert. denied*, 421 U.S. 999, 95

S.Ct. 2396, 44 L.Ed.2d 666 (1975). Child custody cases of this sort are perhaps better characterized as falling under 28 U.S.C. § 1331: whether a tribal court has properly exercised jurisdiction presents a federal question. *See National Farmers Union Ins. Co. v. Crow Tribe*, 471 U.S. 845, 852, 105 S.Ct. 2447, 2451–52, 85 L.Ed.2d 818 (1985). The Eighth Circuit's opinion in *DeMent* appears to be in tension with the Supreme Court's opinion in *Lehman v. Lycoming County Children's Services*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982) (finding writ of habeas corpus unavailable to test legality of state child custody order), and thus the Court of Appeals took pains to distinguish its case on the ground that *Lehman* did not present the question of whether the state court had jurisdiction to render the custody decree. 874 F.2d at 515.

under the authority of the Secretary of the Interior, developed (like those in *Colliflower*) "in part as a federal agency." *Id.* Most important for our analysis, the Court of Appeals in *Settler* held that a *fine* is enough to trigger habeas review—based in part on the court's view that "the petitioner, although not held presently in physical custody, has no other procedural recourse for effective judicial review of the constitutional issues he raises." *Id.* at 490.

*Settler*, of course, did not involve construction of § 1303, but a later state case relied upon *Settler* for the proposition that "the habeas corpus provision of the ICRA is quite expansive," and specifically that a petitioner "need only be detained by the tribal court order, and need not be in custody." *Tracy v. Superior Court of Maricopa County*, 168 Ariz. 23, 810 P.2d 1030, 1049 (1991) (en banc). The relevant passage in *Tracy* is dicta, and we decline the petitioners' request to treat it as an authoritative interpretation of the ICRA, when the case on which it relies both preceded the effective date of the ICRA and contains questionable discussion of the applicable substantive law and the jurisdictional inquiry. *See Edmunds v. Won Bae Chang*, 509 F.2d 39, 42 n. 6 (9th Cir.) (distinguishing *Settler* in case involving $25 fine in non-Indian context), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *see also* COHEN, *supra*, at 669 n. 56 (questioning *Settler*'s conclusions that a fine can trigger habeas review and that federal court review can take place prior to exhaustion of tribal remedies). In sum, courts have not had occasion to fully consider the scope of § 1303, much less reach the conclusion pressed by the petitioners—that § 1303 was to serve as a broader basis of relief than cognate habeas provisions.[21]

b. *Permanent "Banishment" as a Restraint on Liberty*

The conclusion that § 1303 is no broader than analogous statutory provisions for collateral relief does not foreclose the possibility of habeas relief in this case. It is well established that actual *physical* custody is not a jurisdictional prerequisite for federal habeas review. *See, e.g., Jones v. Cunningham*, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963). The respondents acknowledge as much, but claim that habeas review requires "restraints far more closely related to actual imprisonment than the disabilities allegedly suffered by the appellants in this case." Appellees' Br. at 24. The district court agreed, finding that, "[i]n the absence of the imminent possibility of incarceration or at least some other form of ongoing supervision by the Tonawanda Band" or "any tribal official," *Poodry v. Tonawanda Band of Seneca Indians*, No. 92–CV–738A, at 11 (W.D.N.Y. Apr. 13, 1995), the petitioners had "failed to establish that [they are] 'in custody' within the meaning of the habeas corpus statute," *id.* at 10.

We disagree. We begin with three decades of case law rejecting the notion that a writ of habeas corpus, as applied to one subject to a judgment of conviction by a state court, is a formalistic remedy whose availability is strictly limited to persons in actual physical custody. In the 1963 case of *Jones v. Cunningham*, the Supreme Court concluded that the conditions routinely placed on parolees—and the possibility of re-arrest if parole officers believe a violation of those conditions has occurred—constitute restraints on liberty significant enough to render parole a species of "custody" for habeas purposes:

> History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.
>
> . . . .
>
> ... Of course, [the] writ always could and still can reach behind prison walls and iron bars. But it can do more. It is not now and never has been a static, narrow,

---

21. In concluding that Congress did not, in adopting § 1303, intend to create jurisdictional requirements different from those associated with traditional habeas remedies, we do not express a view on whether the substantive provisions of § 1302 must also be treated as coextensive with analogous constitutional provisions.

formalistic remedy; its scope has grown to achieve its grand purpose—*the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.*

371 U.S. 236, 240, 243, 83 S.Ct. 373, 375–76, 377, 9 L.Ed.2d 285 (1963) (emphasis supplied).

In a series of cases following *Jones,* the Court explored the contours of habeas review for individuals facing restraints on their liberty outside of conventional notions of physical custody or for whom the grant of a writ of habeas corpus would not achieve a release from custody. The Court held that a person released on his own recognizance pending sentencing after a state court conviction is "in custody" for habeas jurisdictional purposes, *see Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 1574–75, 36 L.Ed.2d 294 (1973) (finding custody requirement met where terms of personal recognizance required petitioner to appear at times and places as ordered by any court or magistrate; petitioner could not "come and go as he please[d]" and was subject to restraints "'not shared by the public generally'" (quoting *Jones,* 371 U.S. at 240, 83 S.Ct. at 376)), as is one free on his own recognizance while awaiting a trial *de novo* in state court, *see Justices of Boston Mun. Court v. Lydon,* 466 U.S. 294, 301, 104 S.Ct. 1805, 1809–10, 80 L.Ed.2d 311 (1984) (concluding that petitioner's obligation to appear in court and requirement that petitioner not depart the state without the court's leave demonstrated the existence of restraints on the petitioner's personal liberty "not shared by the general public"). *See also United States ex rel. B. v. Shelly,* 430 F.2d 215, 217–18 n. 3 (2d Cir. 1970) (holding that probation, like parole, constitutes "custody" for habeas purposes); *Sammons v. Rodgers,* 785 F.2d 1343, 1345 (5th Cir.1986) (per curiam) (recognizing that jurisdictional prerequisites for habeas review are satisfied if defendant is subject to a suspended sentence carrying a threat of future imprisonment).

As *Jones* and its progeny make clear, while the requirement of physical custody historically served to restrict access to habeas relief to those most in need of judicial attention, physical custody is no longer an adequate proxy for identifying all circumstances in which federal adjudication is necessary to guard against governmental abuse in the imposition of "severe restraints on individual liberty." *Hensley,* 411 U.S. at 351, 93 S.Ct. at 1574; *see* Larry W. Yackle, *Explaining Habeas Corpus,* 60 N.Y.U. L. REV. 991, 998–99 (1985). *See generally* 1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE 191–210 (2d ed.1994). The custody requirement is simply designed to limit the availability of habeas review "to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate." *Hensley,* 411 U.S. at 351, 93 S.Ct. at 1575. Thus, the inquiry into whether a petitioner has satisfied the jurisdictional prerequisites for habeas review requires a court to judge the "severity" of an actual or potential restraint on liberty. The most important example of this inquiry is a line of cases holding that a petition for a writ of habeas corpus cannot be used to challenge a conviction that resulted only in a cash fine or a short-lived suspension of privileges, *compare Edmunds,* 509 F.2d at 39 (modest fine insufficient to trigger custody requirement); *Lillios v. New Hampshire,* 788 F.2d 60, 61 (1st Cir.1986) (per curiam) (requirement not satisfied by modest fines and temporary suspension of driver's license); *Harts v. Indiana,* 732 F.2d 95, 96 (7th Cir.1984) (requirement not satisfied by one-year suspension of driving privileges) *with Dow v. Circuit Court of the First Circuit Through Huddy,* 995 F.2d 922, 923 (9th Cir.) (per curiam) (petitioner sentenced to fourteen hours of attendance at alcohol rehabilitation program "in custody" for purposes of federal habeas relief; requiring petitioner's physical presence at a particular place "significantly restrain[ed] [his] liberty to do those things which free persons in the United States are entitled to do"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 372 (1994), or the collateral consequences of a conviction where the petition is filed after the expiration of the challenged sentence, *see Maleng v. Cook,* 490 U.S. 488, 494, 109 S.Ct. 1923, 1927, 104 L.Ed.2d 540 (1989) (per curiam).

The petitioners have surely identified severe restraints on their liberty. In concluding otherwise, the district court ignored several material factual allegations and erred in its application of the law. The respondents contend that the district court is without subject matter jurisdiction because the revocation of the petitioners' tribal membership is, as a legal matter, not a significant restraint on liberty. They do not appear to contest certain relevant jurisdictional facts: that the banishment notices were served upon three of the petitioners by groups of fifteen to twenty-five people demanding the petitioners' removal; that there have since been other attempts to remove the petitioners from the reservation; that certain petitioners have been threatened or assaulted by individuals purporting to act on the respondents' behalf; and that the petitioners have been denied electrical service. The district court acknowledged the alleged "interfere[nce] with [the petitioners'] peaceful life on the Tonawanda Reservation" and the attempts at forcible removal. Nonetheless, the court found no "on-going supervision by the Tonawanda Band" or "any tribal official," nor any requirement that the petitioners receive "prior approval to do things that an unconvicted person would be free to do." Opinion at 11.

"Restraint" does not require "on-going supervision" or "prior approval." As long as the banishment orders stand, the petitioners may be removed from the Tonawanda Reservation at any time. That they have not been removed thus far does not render them "free" or "unrestrained." While "supervision" (or harassment) by tribal officials or others acting on their behalf may be sporadic, that only makes it all the more 'pernicious. Unlike an individual on parole, on probation, or serving a suspended sentence—all "restraints" found to satisfy the requirement of custody—the petitioners have no ability to predict if, when, or how their sentences will be executed. The petitioners may currently be able to "come and go" as they please, *cf. Hensley*, 411 U.S. at 351, 93 S.Ct. at 1575, but the banishment orders make clear that at some point they may be compelled to "go," and no longer welcome to "come." That is a severe restraint to which the members of the Tonawanda Band are not generally subject. *See id.*

Indeed, we think the existence of the orders of permanent banishment alone—even absent attempts to enforce them—would be sufficient to satisfy the jurisdictional prerequisites for habeas corpus. We deal here not with a modest fine or a short suspension of a privilege—found not to satisfy the custody requirement for habeas relief—but with the coerced and peremptory deprivation of the petitioners' membership in the tribe and their social and cultural affiliation. To determine the severity of the sanction, we need only look to the orders of banishment themselves, which suggest that banishment is imposed (without notice) only for the most severe of crimes: murder, rape, and treason. Had the petitioners been charged with *lesser* offenses and been subjected to the *lesser* punishment of imprisonment, there is no question that a federal court would have the power to inquire into the legality of the tribe's action. The respondents would have us turn the ordinary custody inquiry on its head: the question is not whether a punishment *less* severe than imprisonment—*e.g.*, a fine, probation, or a temporary suspension of privileges—satisfies the custody requirement, but whether a *more* severe punishment does. We believe that Congress could not have intended to permit a tribe to circumvent the ICRA's habeas provision by permanently banishing, rather than imprisoning, members "convicted" of the offense of treason.

The severity of banishment as a restraint on liberty is well demonstrated by the Supreme Court's treatment of (1) "denaturalization" proceedings, initiated where an individual has obtained a certificate of U.S. naturalization illegally or through willful misrepresentation; and (2) statutes imposing a penalty of "denationalization"—forfeiture of American citizenship—on a natural-born U.S. citizen.

Although a denaturalization proceeding is thought to be "civil" or "administrative" in nature, the Supreme Court has long recognized that a deprivation of citizenship is "an extraordinarily severe penalty" with consequences that "may be more grave than con-

sequences that flow from conviction for crimes." *Klapprott v. United States,* 335 U.S. 601, 611–12, 69 S.Ct. 384, 389, 93 L.Ed. 1099 (1949).[22] Similarly, the Court has also found the penalty of denationalization of a natural-born citizen, sought to be imposed after conviction for military desertion, to be unconstitutional. *See Trop v. Dulles,* 356 U.S. 86, 104, 114, 78 S.Ct. 590, 599–600, 605, 2 L.Ed.2d 630 (1958). Writing for a plurality, Chief Justice Warren decried the "total destruction of the individual's status in organized society" that accompanies denationalization:

> It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development....
>
> ....
>
> This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and *when and for what cause his existence in his native land may be terminated. He may be subject to banishment, a fate universally decried by civilized people.* ... It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. *The threat makes the punishment obnoxious.*

*Id.* at 101–02, 78 S.Ct. at 598–99 (emphasis supplied) (footnotes omitted).

To suggest that banishment is a fate "universally decried by civilized people" is not, of course, to say that this was always so. The practice of banishment has existed throughout the history of traditional societies, and in our Anglo–American tradition as well. Although Blackstone described exile as "punishment[ ] ... unknown to the common law," 1 WILLIAM BLACKSTONE, COMMENTARIES * 137,[23] it was not unknown to Parliament. *See* ROBERT HUGHES, THE FATAL SHORE 40 (1987) (describing 1597 act providing that criminals "shall be banished out of this Realm ... and shall be conveyed to ... parts beyond the seas," which served as authority for British transportation of convicts to the American colonies during the seventeenth and eighteenth centuries). Early in American history, the punishment of banishment was imposed upon British loyalists, and was even celebrated as a matter of sound policy in dictum by a Justice of the Supreme Court. *See Cooper v. Telfair,* 4 U.S. (4 Dall.) 14, 20, 1 L.Ed. 721 (1800) ("The right to confiscate and banish, in the case of an offending citizen, must belong to every government.") (Cushing, J.).

The fact that permanent banishment has in the past been imposed as a punitive sanction, in our culture and in others, does not mean that under the laws of the United States it is

---

**22.** Concurring in *Klapprott,* Justice Wiley T. Rutledge wrote:

> To take away a man's citizenship deprives him of a right no less precious than life or liberty, indeed of one which today comprehends those rights and almost all others. To lay upon the citizen the punishment of exile for committing murder, or even treason, is a penalty thus far unknown to our law and at most but doubtfully within Congress' power. Yet by the device or label of a civil suit, carried forward with none of the safeguards of criminal procedure provided by the Bill of Rights, this most comprehensive and basic right of all, so it has been held, can be taken away and in its wake may follow *the most cruel penalty of banishment.*
>
> No such procedures could strip a natural-born citizen of his birthright or lay him open to such a penalty.

335 U.S. at 616–17, 69 S.Ct. at 391–92 (emphasis supplied) (citations omitted); *see Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796 (1943) ("In its consequences, [denaturalization] is more serious than a taking of one's property, or the imposition of a fine or other penalty."); *see also Kungys v. United States,* 485 U.S. 759, 791 n. 6, 108 S.Ct. 1537, 1557 n. 6, 99 L.Ed.2d 839 (1988) (Stevens, J., concurring in judgment).

**23.** The famous Habeas Corpus Act of 1679 provided that "no subject of [the] realm ... shall or may be sent prisoner ... into parts, garrisons, islands or places beyond the seas, which are ... within or without the dominions of his Majesty." An Act for the Better Securing the Liberty of the Subject, and for Prevention of Imprisonments Beyond the Seas (Habeas Corpus Act), 31 Car. 2, ch. 2, § 12 (1679). The Act placed anyone convicted of violating this section beyond the pardon power of the King. *Id.* *See generally* WILLIAM F. DUKER, A CONSTITUTIONAL HISTORY OF HABEAS CORPUS 52–58 (1980).

a sanction not involving a severe restraint on liberty. Where, as here, petitioners seek to test the legality of orders of permanent banishment, a federal district court has subject matter jurisdiction to entertain applications for writs of habeas corpus.

In reaching this conclusion, we recall that this is a case of first impression, and that, if not considered in due course by the Supreme Court, the holding of the case may have significance in the future. This is especially true at a time when some Indian tribal communities have achieved unusual opportunities for wealth, thereby unavoidably creating incentives for dominant elites to "banish" irksome dissidents for "treason." Be that as it may, whatever doubts we might entertain about our construction of this legislation specially crafted for the benefit of Indian tribes is assuaged by the knowledge that, if we are wrong, Congress will have ample opportunity to correct our mistake. See Feins v. American Stock Exch., Inc., 81 F.3d 1215, 1220–21 (2d Cir.1996).

We pause here to offer a respectful rebuttal to two arguments pursued by our colleague in dissent. First, the dissent suggests that the proper jurisdictional inquiry under § 1303 requires a court to measure the severity of the restraints on the petitioners in relation to "the American public at large" rather than in relation to other members of the Tonawanda Band. Dissenting Op. at 902. This conclusion is based principally on the fact that § 1303 makes the privilege of a writ of habeas corpus available to "any person" to test the legality of tribal conduct. We believe the reference to "any person" simply makes clear that § 1303 protects non-Indians and non-member Indians who may come within a tribe's jurisdiction from arbitrary tribal action. It does not follow that § 1303 guards only those liberties shared by all who may invoke its protection. If we recognize, as our dissenting colleague does, that there is something distinct and important about Indian nationhood and culture that the ICRA is designed to promote and sustain, surely § 1303 cannot be thought to guarantee only that "liberty" enjoyed outside an Indian reservation (by "the American public at large").

The dissent concedes that "one who is banished from the United States or excluded from some place within the United States" suffers a severe restraint on liberty, because such an individual cannot go or remain where the rest of the general population has the right to be. Id. at 903. Yet a deprivation of citizenship does more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence. To measure whether summary banishment from a tribe constitutes a severe deprivation solely by reference to the liberties of other Americans is tantamount to suggesting that the petitioners cannot live among members of their nation simply because other Americans cannot do so; and that the coerced loss of an individual's social, cultural, and political affiliations is unimportant because other Americans do not share them. Such an approach renders the concept of liberty hollow indeed.

Second, the dissent suggests that permitting a federal court to review a tribe's decision to banish one of its members would constitute undue interference with a tribe's sovereign power to determine tribal membership. Id. at 904–905. In examining what tribal sovereignty does and does not permit, the dissent merges the jurisdictional analysis that we must undertake in this case with an inquiry on the merits. We respectfully but emphatically disagree with the suggestion that "the decisive question on this appeal [is] whether the Tonawanda Band had the power to strip petitioners of their tribal membership," id. at 905; the question is, rather, whether a federal court has jurisdiction to examine the scope of and limitations on the Tonawanda Band's power to strip the petitioners of their tribal membership. See supra pp. 884, 888. Moreover, the dissent appears to resolve the inquiry on the merits without reference to the will of Congress. While we fully agree that the power to determine questions of tribal membership is one aspect of retained tribal sovereignty, see supra p. 880, that power exists only to the extent that it is not limited by treaty or federal statute. See Santa Clara Pueblo, 436 U.S. at 55–56, 98 S.Ct. at 1675 ("[Indian tribes] have power to make their own sub-

stantive law in internal matters.... [H]owever, Congress has plenary authority to limit, modify, or eliminate the powers of local self-government which the tribes otherwise possess."); *Wheeler*, 435 U.S. at 322 n. 18, 98 S.Ct. at 1086 n. 18 ("[U]nless limited by treaty or statute, a tribe has the power to determine tribe membership...."); *Martinez v. Southern Ute Tribe*, 249 F.2d at 920 ("[I]n [the] absence of express legislation by Congress to the contrary, a tribe has the complete authority to determine all questions of its own membership, as a political entity...."). Although we do not reach the question here, we note that Title I of the ICRA may well be a federal statute that imposes limitations on a tribe's power to summarily banish its members.

It is for this reason that the dissent's reliance on *Roff v. Burney*, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897), a case decided seventy-one years prior to Congress's enactment of Title I of the ICRA, is misplaced. Dissenting Op. at 905. In *Roff*, the Court sustained the authority of a tribal legislature to "cancel[ ] the rights of citizenship" granted to certain individuals and to direct the removal of those individuals "beyond the limits of the nation," reasoning as follows:

> The only restriction on the power of the [tribe] to legislate in respect to its internal affairs is that such legislation shall not conflict with the Constitution or laws of the United States, and *we know of no provision of such Constitution or laws which would be set at naught* by the action of a political community like this in withdrawing privileges of membership in the community once conferred.

168 U.S. at 222, 18 S.Ct. at 62 (emphasis supplied). In 1897 the Supreme Court "kn[e]w of no provision of ... [the] laws [of the United States] which would be set at naught" by the actions of a tribe in circumstances such as those presented here, but we believe that in our time Title I of the ICRA may be such a law. Simply stated, *Roff* does not support the proposition that no federal law *now* limits the power of a tribe to expel its members.

In sum, it is premature in the posture of this case to address the question of whether a tribe's sovereign powers permit banishment, and it is error to purport to resolve this question without reference to the Indian Civil Rights Act.

### D. *The Tonawanda Band as Respondent*

Having concluded that the petitions should be considered on the merits by the district court, we turn briefly to the question of whether the Tonawanda Band of Seneca Indians is a proper respondent in this action.

The named respondents in this suit include both the tribe itself and the tribal officials alleged to have imposed the orders of banishment upon the petitioners. Indian tribes and their governing bodies possess common law immunity from suit absent an unequivocal waiver by the tribe or abrogation by Congress. *See Santa Clara Pueblo*, 436 U.S. at 58–59, 98 S.Ct. at 1677; *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656–57, 84 L.Ed. 894 (1940). In *Santa Clara Pueblo*, the Court found that Title I of the Indian Civil Rights Act did not constitute congressional abrogation of tribal sovereign immunity, reasoning as follows:

> Nothing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief. Moreover, since the respondent in a habeas corpus action is the individual custodian of the prisoner, *see, e.g.,* 28 U.S.C. § 2243, the provisions of § 1303 can hardly be read as a general waiver of the tribe's sovereign immunity.

436 U.S. at 59, 98 S.Ct. at 1677. The district court, relying upon this passage, concluded that the Tonawanda Band was not a proper respondent in this action. The petitioners challenge this conclusion, claiming that while § 1303 is not a *general* waiver of sovereign immunity for civil actions under Title I of the ICRA, it serves as a *specific* and unequivocal waiver of sovereign immunity for habeas corpus actions brought under that statute. The petitioners call our attention to the distinction between § 1303, which guarantees the availability of a writ of habeas corpus to test the legality of an individual's detention "by

order of an *Indian Tribe,*" and 28 U.S.C. § 2243, which specifically identifies the custodian of the prisoner as the proper respondent in a habeas action. They contend that the reference to the "tribe" in § 1303, and the passage from *Santa Clara Pueblo* quoted above, support the conclusion that a tribe itself is a proper respondent in a habeas action under § 1303.

We disagree. As previously discussed, we do not believe that Congress intended § 1303 to enact a unique variety of habeas review. *See supra* pp. 890–893. Section 1303 merely identifies *tribal* authority—as opposed to *state* or *federal* authority, *cf.* 28 U.S.C. §§ 2241(c)(1), 2254, 2255—as the source of the conduct allegedly taken in violation of federal law or the Constitution. An application for a writ of habeas corpus is never viewed as a suit against the sovereign, simply because the restraint for which review is sought, if indeed illegal, would be outside the power of an official acting in the sovereign's name. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1949) (noting that, in actions for habeas corpus, "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign"); *Ex parte Young,* 209 U.S. at 167–68, 28 S.Ct. at 457 (noting that, in a habeas action challenging custody as unconstitutional, "it has never been supposed that there was any suit against the State by reason of serving the writ upon one of the officers of the state in whose custody the person was found"); *see also United States ex rel. Elliott v. Hendricks,* 213 F.2d 922, 926 (3d Cir.) (noting Blackstone's view that "the writ is not against the crown"; " 'the king is at all times entitled to have an account why the liberty of any of his subjects is restrained' and 'the extraordinary power of the crown is called to the party's assistance' " (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *131, *132)), *cert. denied,* 348 U.S. 851, 75 S.Ct. 77, 99 L.Ed. 670 (1954).

■ Thus, § 1303 does not signal congressional abrogation of tribal sovereign immunity even in habeas cases. In claiming otherwise, the petitioners misapprehend the reasoning of the cited passage from *Santa Clara Pueblo:* not only does § 1303 not serve as a general waiver of immunity in civil suits, there is no immunity issue here at all. Because a petition for a writ of habeas corpus is not properly a suit against the sovereign, the Tonawanda Band is simply not a proper respondent.

■ The petitions also name as respondents the tribal officials allegedly responsible for issuing the banishment orders in this case. The respondents do not claim that tribal immunity bars actions against tribal officers for writs of habeas corpus. We note only that the individual respondents can be properly thought "custodians" of the petitioners, despite the fact that the petitioners, though restrained, are not in physical custody. As the "custody" requirement has expanded to encompass more than actual physical custody, so too has the concept of a custodian as a respondent in a habeas case. In examining who the proper respondent would be in a case involving a petitioner free on bail prior to a possible retrial, the Seventh Circuit has observed that

[a] person released on his own recognizance is usually considered to be in his own custody; a person released after posting bail is usually considered to be in either his lawyer's custody or the bondsman's custody. But it would be odd to make any of these the respondent in a habeas corpus action....

. . . .

The truth is that no one has custody of a person who is out on bail but that the Supreme Court has decided that such a person should be allowed to seek unconditional freedom through an action for habeas corpus despite the absence of a custodian. The important thing *is not the quest for a mythical custodian, but that the petitioner name as respondent someone (or some institution) who has both an interest in opposing the petition if it lacks merit, and the power to give the petitioner what he seeks if the petition has merit—namely, his unconditional freedom.*

*Reimnitz v. State's Attorney of Cook County,* 761 F.2d 405, 408–09 (7th Cir.1985) (emphasis supplied). The individual respondents

surely fit this description—they have an interest in opposing the petitions, as well as the ability to lift the banishment orders should the petitions be found on remand to have merit.

## III

■ Finally, we address briefly a tension inevitable in any case involving questions of rights and questions of culture: whether the principles that guide our inquiry into the "criminal" or "civil" nature of the tribal action in this case or the severity of the restraint imposed must be "culturally defined" by the tribe, or whether we can approach these questions guided by general American legal norms or certain universal principles. Here, the respondents adopt a stance of cultural relativism, claiming that while "treason" may be a crime under the law of the United States, it is a civil matter under tribal law; and that while "banishment" may be thought to be a harsh punishment under the law of the United States—indeed, Chief Justice Warren described it as a "fate universally decried by civilized people," *Trop,* 356 U.S. at 102, 78 S.Ct. at 599—it is necessary to and consistent with the culture and tradition of the Tonawanda Band.

We are unpersuaded. First, as previously indicated, we doubt that such an argument would be relevant in this context. As discussed fully *supra* pp. 890–893, Congress did not intend with § 1303 to enact a special variety of habeas review. Habeas corpus is, of course, a peculiarly Anglo–American remedy. No one has suggested that the ICRA's remedial provision, not to speak of its enumeration of basic rights, is rooted in Indian culture or history. And yet the fact remains that Congress enacted Title I of the ICRA specifically for cases involving actions taken by an Indian nation against its members. Permitting a tribe to avoid federal court jurisdiction by the mere incantation of principles of cultural relativism would render the congressionally created remedy useless.

Second, even if we thought the proposed inquiry relevant, sworn statements submitted to the district court on behalf of the petitioners in this case counsel against accepting the respondents' attempt to avoid jurisdiction on

grounds of tradition and culture at face value. If true, those statements would support a finding that "banishment" has not occurred within the Tonawanda Band within living memory, and that, to the extent that "banishment" is appropriate at all, it was not here imposed in the manner that tribal traditions actually prescribe. Were the mere invocation of cultural difference and tradition to preclude jurisdiction—even in the face of sworn statements suggesting the possibility that the "tradition" is not as claimed—our recognition of cultural relativism could only create a refuge for repression.

But we need not resolve the debate on whether basic rights can or should be culturally defined to resolve this case. We deal here not with a foreign state, but with admittedly distinct communities that have had a unique relationship with our federal government for centuries—a relationship that exists within the framework of American institutions and, in the last analysis, under American law. We need not condone policies pursued in the early years of our nation to conclude that federal influence—such as the role of the Bureau of Indian Affairs in recognizing a ruling council of the Tonawanda Band—is intertwined with tribal power. In this respect, the wide dissemination of material proclaiming to federal and state officials the petitioners' "convict[ion]" and "banishment"—indeed, seeking aid in removing the petitioners from the Tonawanda Reservation—speaks for itself. The respondents wish to use their connection with federal authorities as a sword, while employing notions of cultural relativism as a shield from federal court jurisdiction. We need not question the power of Indian nations to govern, to establish membership criteria, to exclude outsiders, or to regulate the use of their land and resources in order to acknowledge and vindicate a federal responsibility for those American citizens subject to tribal authority when that authority imposes criminal sanctions in denial of rights guaranteed by the laws of the United States. In sum, there is simply no room in our constitutional order for the definition of basic rights on the basis of cultural affiliations, even with respect to those communities whose distinctive

"sovereignty" our country has long recognized and sustained.

### CONCLUSION

To summarize:

1. The district court improperly concluded that it lacked subject matter jurisdiction to entertain the petitioners' applications for writs of habeas corpus under 25 U.S.C. § 1303.

a. We are unpersuaded by the respondents' claim that the orders of permanent banishment are "civil" in nature, representing membership determinations committed to the absolute discretion of the tribe. The respondents have here imposed punitive sanctions upon the petitioners for allegedly criminal conduct; the respondents' actions are not insulated from habeas review merely because they involve or affect membership in the tribe.

b. In enacting 25 U.S.C. § 1303, Congress did not seek to create a more expansive role for federal courts reviewing tribal actions than analogous statutes authorizing collateral review of state and federal action would permit. Accordingly, the fact that a tribe has imposed a criminal sanction does not *itself* trigger application of § 1303; the petitioners must satisfy the jurisdictional prerequisite for habeas review by demonstrating a sufficiently severe potential or actual restraint on liberty.

c. The petitioners have here demonstrated a sufficiently severe restraint on liberty.

2. Although the petitioners' applications for writs of habeas corpus should be heard on the merits by the district court, the Tonawanda Band of Seneca Indians is not a proper respondent in this case. The petitions for writs of habeas corpus are properly viewed as directed against *tribal officials* allegedly acting in violation of federal law and therefore outside of the lawful authority of the tribe; the Indian Civil Rights Act of 1968 does not authorize habeas actions against the tribe itself.

We therefore affirm the district court's dismissal of the Tonawanda Band of Seneca Indians as a respondent. We vacate the orders of dismissal in favor of the remaining respondents and remand the cause for further proceedings consistent with this opinion.

JACOBS, Circuit Judge, dissenting:

In many respects, I concur in the thoughtful and learned majority opinion. I thus agree that the Tonawanda Band is not a proper respondent, Maj. Op. at 899; that the writ afforded in section 1303 was intended by Congress to have no broader reach than the cognate statutory provisions governing collateral review of state and federal action, *id.* at 893; and that the writ therefore cannot issue unless petitioners show a severe actual or potential restraint on liberty, *id.* at 894. I respectfully dissent because I do not think these respondents have demonstrated a severe restraint on any liberty that the writ of habeas corpus protects. That conclusion would obviate any need to decide whether the order of banishment is an exercise of civil law or criminal law, or something else; still, I am bound to say that I view the conclusion in the majority opinion—that the banishment of these petitioners is a criminal penalty—as dubious.

For reasons adduced in the majority opinion, the "detention" required to support habeas corpus jurisdiction under section 1303 in no way differs from the general understanding of the term "custody" in other habeas corpus statutes. While I have found no controlling (or persuasive) cases that discuss whether banishment constitutes custody for purposes of habeas corpus, the Supreme Court has articulated some general principles:

> The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. Since habeas corpus is an extraordinary remedy whose operation is ... uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.

*Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 1575, 36 L.Ed.2d 294

(1973). While courts should not "suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements," *id.* at 350, 93 S.Ct. at 1574, the writ should not issue unless a court discerns a "severe restraint[ ] on individual liberty," *id.* at 351, 93 S.Ct. at 1574. I conclude that, although the banishment of petitioners from the Tonawanda Band is a harsh measure, imposed here with small provocation, it cannot be deemed a restraint that habeas corpus can reach. Furthermore, I conclude that issuance of the writ here would impinge upon the tribe's power to define its membership and thereby disserves the ICRA goal of promoting tribal self-government.

## A. *Petitioners' Rights.*

Petitioners claim that their liberty is restrained because the tribe threatens to remove them involuntarily from the tribe, their land, homes, and businesses, and to bar their return. Putting aside whether the threat of banishment is distinguishable from actual banishment, no one can discount the drastic impacts (cultural, economic, and social) that banishment and exclusion would have on one who has been a member of the Tonawanda Band. However, I think it is an error to measure the severity of the restraint by reference to the liberties enjoyed by the Tonawanda tribal community. There is of course no doubt that the petitioners, if banished, will lose all the rights conferred by the tribal sovereignty. But the proper inquiry is whether the petitioners, if banished, will suffer a severe impairment of the liberties that are enjoyed by the American public at large.

The applicable principle is that habeas corpus responds to restraints that are "not shared by the public generally." *Hensley,* 411 U.S. at 351, 93 S.Ct. at 1575 (quoting *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 376, 9 L.Ed.2d 285 (1963)). Section 1303 is no different in this respect. It grants "any person" the right to challenge through habeas corpus any detention by an Indian tribe. The term "any person," which obviously includes members of Indian tribes, applies just as clearly to non-tribal Americans and to anyone else in the country. Since "any person" may seek relief from a severe restraint on liberty imposed by an Indian tribe, it follows that the restraints contemplated by the statute, and remediable by a writ of habeas corpus, are restraints on the liberties ordinarily enjoyed by "any person" and not solely or even especially by members of the Indian tribes.

What restraints will be brought to bear upon the petitioners after they are banished from the Tonawanda Band and its reservation? What liberties will they thereby lose? Natural born members of the Tonawanda Band are citizens of the United States. 8 U.S.C. § 1401(b). Once they exit the reservation, petitioners will be free to settle and travel where they wish, and to come and go as they please, in the same way and to the same extent as any other person in the United States. Although that freedom does not confer a right to settle or trespass on private lands, or on lands reserved to any Indian nation, the petitioners' constitutional rights will in no way be diminished after banishment; indeed, they will then enjoy important constitutional rights that are not guaranteed by the ICRA on the Tonawanda reservation. For example, a tribe may establish a religion, need not provide jury trials in civil cases, need not appoint counsel to indigent criminal defendants, and is not required to initiate criminal prosecutions by grand jury indictment. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 63 & n. 14, 98 S.Ct. 1670, 1679 & n. 14, 56 L.Ed.2d 106 (1978) (discussing ICRA's selective incorporation of provisions of the Bill of Rights).

The petitioners analogize banishment to alien exclusion, deportation, denaturalization or denationalization, and rely upon lines of cases holding that those deprivations support issuance of the writ. Banishment from an Indian nation differs in some critical respects from the loss of rights faced by persons facing shipment abroad or a loss of citizenship that prefigures exile. One who is excluded or deported from the United States may go to a native and congenial country that guarantees every essential liberty; nevertheless, that departure means the loss of the liberties enjoyed by the general populace of the United States, and it is *that* loss of rights that conceptually justifies habeas relief

from our courts. This view is entirely consistent with the observation in *Jones v. Cunningham* that "habeas corpus is available to an alien seeking entry into the United States, although in those cases each alien was free to go anywhere else in the world." 371 U.S. at 239, 83 S.Ct. at 375 (footnote omitted).

There are additional reasons why the habeas rights of excluded aliens offer no analogy useful to petitioners. First, an excluded alien's right to invoke habeas corpus is a specific statutory right conferred by Congress. *See* 8 U.S.C. § 1105a(b) ("[A]ny alien against whom a final order of exclusion has been made ... may obtain judicial review of such order by habeas corpus proceedings...."). Second, the Supreme Court in *Brownell v. We Shung*, 352 U.S. 180, 183, 77 S.Ct. 252, 255, 1 L.Ed.2d 225 (1956)—one of the precedents cited in *Jones*—confirmed that any excluded alien seeking habeas corpus must still "be detained or at the least be in technical custody." *Id.* The excluded alien cases therefore do not expand the meaning of the term "custody" for purposes of habeas corpus jurisdiction; they merely affirm the well settled rule that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950)).

Petitioners' reliance on deportation cases is misplaced for all the same reasons. Deportation separates the individual from the rights and liberties enjoyed by the American populace at large. The availability of habeas corpus relief in deportation cases is also a matter of statutory law. 8 U.S.C. 1105a(a)(10) ("[A]ny alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings."). Moreover, in creating this remedy, Congress provided (without elaboration) that the petitioning alien must be "in custody" to invoke section 1105a(a)(10). *See id.* The deportation statute therefore does not weaken or modify the usual requisite of habeas corpus jurisprudence that the petitioner show a restraint on liberty.

Similarly, the Supreme Court has held that denationalization violates the Eighth Amendment because it strips an individual of "the right to have rights" and raises the threat of banishment from all of the United States. *Trop v. Dulles*, 356 U.S. 86, 101–02, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Banishment is therefore a severe restraint on the liberty of one who is banished from the United States or excluded from some place within the United States that the general population has the right to be. Doubtless, petitioners could plausibly claim a severe restraint on liberty if they were facing banishment *to* the Tonawanda reservation.[1] But I do not see how banishment *from* the Indian reservation supports habeas relief. In terms of our habeas corpus jurisdiction, banishment *to the United States* is a meaningless concept.

The majority opinion points out that the petitioners are complaining about several forms of restraint, of which banishment is only one, and enumerates them. In my view, these do not add up to the requisite severe restraint on liberty. Thus, the respondents "attempted (without success) to take petitioners ... into custody and eject them." Maj. Op. at 878. From this allegation it appears that the petitioners have *not* been taken into custody, and that the effort to lay hands on them was for the sole purpose of releasing them outside the reservation, not to detain them on it. Other alleged deprivations—the "continue[d][ ] harass[ment] and assault," *id.* at 878, the "stoning" of petitioner Peters, *id.*, the "deni[al of] electrical service to their homes and businesses," *id.* at 878, 895, the instruction that petitioners' names be removed from the list of eligible clients of the reservation clinic, *id.* at 878, and a continuing

---

1. In *United States ex rel. Standing Bear v. Crook*, 25 F. Cas. 695 (C.C.Neb.1879), persons who had withdrawn from the Ponca tribe, severing their relations with it and taking up the ways of American life, petitioned for a writ of habeas corpus to block an army officer from returning them to the Indian country. Granting the writ, the court observed: "If they could be removed to the Indian Territory by force, and kept there in the same way, I can see no good reason why they might not be taken away and kept by force in the penitentiary...." 25 F. Cas. at 700.

"supervision" (which seems to be no more than a hostile observation), *id.* at 895—do not amount to restraints of the person, and cannot very well be remedied by a writ of habeas corpus. Certainly, the writ of habeas corpus is an ill-adapted device for regulating utility services or clinic privileges.

The order of banishment itself, set forth in the majority opinion, recites the particular deprivations allegedly imposed. *See* Maj. Op. at 878. In addition to banishment, the petitioners' "lands will become the responsibility of the Council of Chiefs," petitioners will suffer loss of their tribal names, citizenship, and rights of membership, and their names will be removed from the tribal rolls. Do any of these deprivations justify issuance of the writ?

It was undisputed at oral argument that the lands at issue are tribal lands allotted by the tribe but not owned by the individual members. It has long been settled that

> the powers of an Indian tribe with respect to tribal land are not limited by any rights of occupancy which the tribe itself may grant to its members, that occupancy of tribal land does not create any vested rights in the occupant as against the tribe, and that the extent of any individual's interest in tribal property is subject to such limitations as the tribe may see fit to impose.

Felix S. Cohen, *Handbook of Federal Indian Law* 144 (1941) (footnotes omitted). *See Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 665, 99 S.Ct. 2529, 2536–37, 61 L.Ed.2d 153 (1979) ("Whatever title [in tribal land] the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members." (internal quotation marks and citations omitted)); *Crowe v. Eastern Band of Cherokee Indians, Inc.,* 506 F.2d 1231, 1235 (4th Cir.1974) ("There can be no individual ownership of tribal land and the individual's right of use depends upon tribal law or custom."); *Northern Cheyenne Tribe v. Northern Cheyenne Defendant Class of Allottees, Heirs, & Devisees,* 505 F.2d 268, 273 (9th Cir.1974) ("[S]o long as the land remains tribal in character the individual Indian has no vested right, as against the tribe, to any

specific part of the tribal property."), *rev'd on other grounds,* 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976).

Off the reservation, each petitioner has the right to use his tribal name or any other name he wishes (other than one selected to defraud creditors), and the tribe's banishment order cannot prevent him from doing so. On the reservation, the other members may refuse to utter the petitioners' tribal names, and a writ of habeas corpus (assuming jurisdiction to issue one) cannot force them to use those names. As to citizenship and rights of membership, I believe that the tribe has sovereign power to determine its membership, for the reasons stated in section B, *infra.* And as to the tribal rolls: to the extent that the rolls merely reflect the tribe's own membership decisions, the addition or removal of names seems to be a function of the tribe's undoubted power to make that determination. To the extent that rolls are maintained to determine entitlement to federal payments or federally controlled funds, the rolls are maintained by the Secretary of the Interior rather than by the tribe. 25 U.S.C. § 163.

#### B. *Tribal Powers.*

I therefore conclude that the only restriction claimed by petitioners that could remotely be deemed to support habeas relief is the deprivation of their right to live in and among the Tonawanda nation (and the threat that this exclusion will be visited upon them). However, Tonawanda membership (and the concomitant right to dwell on the Tonawandas' lands) is emphatically not a right "shared by the public generally." As an Indian tribe, the Tonawanda Band retains "those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of [its] dependent status." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). It is well settled that a tribe may physically exclude non-members entirely or condition their presence on its reservation. *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 333, 103 S.Ct. 2378, 2385–86, 76 L.Ed.2d 611 (1983). Petitioners point to no provision in any treaty or statute that evidences a con-

gressional intent to limit the Tonawanda Band's power to exclude or expel.

Given this power of the Indian nations to exclude *non-members*, the decisive question on this appeal becomes whether the Tonawanda Band had the power to strip petitioners of their tribal membership. The Supreme Court has not decided that question, but I think that it has pointed the way: "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n. 32, 98 S.Ct. 1670, 1684 n. 32, 56 L.Ed.2d 106 (1978). *See also Wheeler*, 435 U.S. at 322 n. 18, 98 S.Ct. at 1086 n. 18 ("[U]nless limited by treaty or statute, a tribe has the power to determine tribe membership...."); *Martinez v. Southern Ute Tribe*, 249 F.2d 915, 920 (10th Cir. 1957) ("[I]n absence of express legislation by Congress to the contrary, a tribe has the complete authority to determine all questions of its own membership, as a political entity.... It appears that for purposes of which the tribe has complete control, the tribe conclusively determines membership ...."), *cert. denied*, 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958); *Johnson v. Eastern Band Cherokee Nation*, 718 F.Supp. 6 (N.D.N.Y.1989) (observing that "[t]he Supreme Court has held that controversies surrounding membership in an Indian Nation are reserved to the tribe's discretion, and therefore do not present a question of federal law," and dismissing suit to enjoin plaintiff's exclusion from an Indian tribe for lack of subject matter jurisdiction). The order of banishment in this case is harsh and disturbing, but a tribe's prerogative to define itself as a "culturally and politically distinct entity," *Santa Clara Pueblo*, 436 U.S. at 72, 98 S.Ct. at 1684, is a "delicate" matter in which federal courts should not lightly intrude, *id.* at 72 n. 32, 98 S.Ct. at 1684 n. 32, notwithstanding harsh consequences.

There is every reason to think that this tribal prerogative extends to the expulsion of existing tribal members. In *Roff v. Burney*, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897), a case cited in *Santa Clara Pueblo* as well as in *Wheeler*, a United States citizen whose wife had become a citizen of the Chickasaw Nation through Chickasaw legislation and was later stripped of her citizenship by a subsequent enactment, sued a representative of the tribe on a property-rights claim. The Court, which held that there was federal jurisdiction over the suit, observed: "[t]he Chickasaw legislature, by the second act, ... not only repealed the prior act, but canceled the rights of citizenship granted thereby, and further directed the governor to remove the parties named therein and their descendents beyond the limits of the nation." *Roff*, 168 U.S. at 222, 18 S.Ct. at 62. In a word, they were banished. The Court stated:

> The citizenship which the Chickasaw legislature could confer it could withdraw. The only restriction on the power of the Chickasaw Nation to legislate in respect to its internal affairs is that such legislation shall not conflict with the constitution or laws of the United States, and we know of no provision of such constitution or laws which would be set at naught by the action of a political community like this in withdrawing privileges of membership in the community once conferred.

*Id.*

C. *Conclusion.*

It cannot be said that the American populace at large, which has no right to settle on lands reserved to the Tonawanda, lives under a restraint that justifies issuance of a writ. It follows that the exclusion or "banishment" of *non*-members from the Indian nations is not a restraint of their liberty. No different rule can be applied to members of the tribe without abridging the tribe's sovereign power (one of the few appreciable sovereign powers remaining) to decide who is a member and who is not. This limitation on our habeas corpus jurisdiction under section 1303 serves the "[t]wo distinct and competing purposes" of the ICRA. *See Santa Clara Pueblo*, 436 U.S. at 62, 98 S.Ct. at 1678. On the one hand, the statute seeks to strengthen the rights of individual members against tribal power; on the other hand, it promotes the "well-established federal policy of furthering Indian self-government." *Id.* (internal quotation marks and citation omitted). While

sections 1302 and 1303 grant substantive rights and afford a habeas corpus remedy, other provisions of the ICRA limit state jurisdiction over Indian matters, strengthen tribal courts, and minimize interference in tribal litigation by the Federal Bureau of Indian Affairs. *Id.* at 63–64, 98 S.Ct. at 1679–80. The circumscribed remedial power of the federal courts preserves that balance. "Congress apparently decided that review by way of habeas corpus would adequately protect the individual interests at stake while avoiding unnecessary intrusions on tribal government." *Id.* at 67, 98 S.Ct. at 1682. If we broaden the meaning of "detention" in section 1303 to include tribal banishment, the result will be a gross interference with tribal sovereignty—the abrogation of its ability to define itself—accomplished by means of a statute intended to promote tribal self-government.

Moreover, the writ that is sought cannot remedy many of the wrongs alleged. Tribal property and the quiet enjoyment of it cannot be allotted by writ; nor can the writ restore the petitioners' roles in tribal affairs or their utility service, allay the hostility of their fellows, or force people to address the petitioners by their tribal names. If we had the power, by a writ of habeas corpus, to restore the petitioners to their culture and birthright, we still could not do it without dismantling the vestiges of tribal sovereignty that Congress requires us to preserve.

I agree with my colleagues that this case raises issues of cultural and political accommodation that may justify consideration of this question by Congress. Until Congress acts, however, I agree with Judge Arcara that subject matter jurisdiction is lacking, because (i) section 1303 is the sole source of potential jurisdiction; (ii) the threat of petitioners' banishment from the Tonawanda Band is not "detention" within the meaning of section 1303, and (iii) petitioners' other grounds urged for grant of the writ, such as denial of health benefits and electric service, do not support jurisdiction.